NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230167-U

NOS. 4-23-0167, 4-23-0168 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 24, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Ah. R., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Winnebago County |
|     Petitioner-Appellee, | ) | No. 21JA87 |
|     v.   (No. 4-23-0167) | ) | |
| Brooke R., | ) | |
|     Respondent-Appellant). | ) | |
| | ) | |
| | ) | |
| *In re* Am. R, a Minor | ) | |
| | ) | No. 21JA88 |
| (The People of the State of Illinois, | ) | |
|     Petitioner-Appellee, | ) | |
|     v.   (No. 4-23-0168) | ) | |
| Brooke R., | ) | Honorable |
|     Respondent-Appellant). | ) | Francis M. Martinez, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Turner and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed the judgment of the trial court terminating respondent's parental rights because the court's fitness and best interest findings were not against the manifest weight of the evidence.

¶ 2    Respondent, Brooke R., is the mother of Ah. R. (born March 2019) and Am. R. (born January 2016). The father of Ah. R., Ahmed A., is not a party to this appeal. The father of Am. R. is unknown.

¶ 3    In February 2023, the trial court found respondent and the fathers were unfit parents

and that termination of their parental rights would be in the minor children's best interests.

¶ 4 Respondent appeals, arguing that the trial court's (1) fitness determinations and (2) best-interest determinations in each case were against the manifest weight of the evidence. We disagree and affirm.

¶ 5 I. BACKGROUND

¶ 6 A. Procedural History

¶ 7 In March 2021, the State filed separate petitions for adjudication of wardship, alleging that the environment of Ah. R. and Am. R. was injurious to their welfare because respondent and a paramour engaged in acts of domestic violence in the presence of the minors. See 705 ILCS 405/2-3(1)(b) (West 2020). In April 2021, the trial court conducted a shelter care hearing and placed temporary custody and guardianship with the guardianship administrator of the Illinois Department of Children and Family Services (DCFS).

¶ 8 In July 2021, the trial court conducted an adjudicatory hearing at which respondent stipulated that domestic violence occurred in the presence of the children. The court found that Ah. R. and Am. R. were neglected minors. At the August 2021 dispositional hearing, the court entered a written order finding that it was in the best interest of Ah. R., Am. R., and the public that the minor children be made wards of the court and adjudicated neglected minors. The court further found that the parents were unable for reasons other than financial circumstances alone to care for, protect, train, or discipline the minors and it was in the best interest of the minors to remove them from the custody of respondent. The court placed the minors' guardianship and custody with the guardianship administrator of DCFS.

¶ 9 At that hearing, the trial court admonished respondent that she was required to cooperate with DCFS "and make reasonable efforts and reasonable progress toward correcting

conditions that *** led to removal of the *** children." The court further warned respondent that, should she fail to make reasonable efforts and progress, the State would have the authority to seek termination of her parental rights.

¶ 10                     B. The Termination Proceedings

¶ 11          In December 2022, the State filed petitions in both cases to terminate respondent's parental rights. The State alleged respondent was an unfit parent because she failed to (1) make reasonable efforts to correct the conditions that were the bases for the removal of the children during the nine-month periods of July 2021 to April 2022 and February 2022 to November 2022; (2) make reasonable progress toward the return of the children within the same nine-month periods; and (3) maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare. See 750 ILCS 50/1(D)(b), (D)(m)(i), (ii) (West 2020).

¶ 12          1. *The Fitness Portion of the Termination Proceedings*

¶ 13          In January 2023, the trial court conducted the fitness portion of the termination proceedings. At the State's request, the court took judicial notice of (1) the neglect petitions, (2) the temporary custody order, (3) the adjudicatory order, (4) the dispositional order, and (5) the permanency review orders. At the State's request, and without objection, the court admitted the integrated assessment report and three service plans.

¶ 14          a. Testimony of Mercedes Sanchez

¶ 15          The State called Mercedes Sanchez as its sole witness. Sanchez had been the case supervisor at the Children's Home and Aid Society of Illinois (CHASI) for Am. R. and Ah. R. since October 2021. She had also briefly served as the caseworker. Sanchez testified without objection to the contents of the admitted documents and the observations of her coworkers.

¶ 16          i. *The Basis for Removal*

¶ 17      Counsel for respondent asked Sanchez why Ah. R. and Am. R. came into care. Sanchez answered that "there were concerns with *** [respondent's] ability to safely parent her kids, as *** she was involved in criminal activity and her house had gotten shot at." Asked whether CHASI had "concerns with domestic violence," Sanchez said, "Based on the history, yes." She clarified that this history was not with Ah. R.'s father but with respondent's "past paramours."

¶ 18                    ii. *The Service Plans*

¶ 19      Sanchez testified that the service plan for respondent was developed after respondent participated in an integrated assessment. Included in such assessments are reviews of a parent's family and childhood history, his or her relationships, and any criminal history. The plan recommended that respondent engage in services relating to (1) substance abuse, (2) domestic violence, (3) parenting, and (4) individual counseling.

¶ 20                    iii. *Communication with Respondent*

¶ 21      Sanchez testified that communications with respondent had been irregular. Caseworkers had particular difficulty arranging in-person meetings with respondent. Although CHASI received the case in April 2021, respondent did not meet with CHASI workers until August of that year. CHASI informed respondent of the importance of completing services.

¶ 22      In November 2021, respondent told her caseworker she had moved to Texas. From then on, respondent would tell CHASI when she was in Rockford only after she had arrived. Sanchez said respondent explained her move to Texas as "running away" from people in Rockford who were "looking for her to harm her."

¶ 23                    iv. *Respondent's Parenting Skills*

¶ 24      Sanchez testified that CHASI had concerns about respondent's parenting skills because the infrequency of her visitations meant that the agency had not been able to assess her

skills. Respondent's failure to have a substance abuse assessment precluded CHASI's referring her to a parenting class. CHASI would offer a referral only if she were following the recommendations made in the assessment or had enrolled in a substance abuse class. CHASI had no information to suggest respondent had independently enrolled in a parenting class.

¶ 25    v. *Respondent's Record of Visitation and Communication with Her Children*

¶ 26    Sanchez explained that CHASI wanted respondent to engage in at least one hour a week of visitation with the minors. Respondent's irregular communications and the uncertainty over whether she was in Illinois or Texas made arranging regular visitation impossible. The agency had no objection to visits over Zoom, FaceTime, or similar apps and, in the spring of 2022, had discussed the possible use of the apps with respondent.

¶ 27    CHASI workers had asked respondent why she was not calling her children regularly. Respondent said there was no reason. Nonetheless, months would go by without her calling either child. In September 2022, respondent started having FaceTime visits with Ah. R. However, respondent made such visits only sporadically. These visits were permitted when someone was present to supervise. Sanchez had supervised video visits between respondent and Ah. R., who called respondent "Mom."

¶ 28    CHASI learned through the children's caregivers that respondent would come to Rockford and visit Am. R. without notifying CHASI. She sometimes visited Am. R. but not Ah. R. The only instances of respondent's providing food or gifts that CHASI were aware of included (1) when respondent sent ice cream to Am. R. by DoorDash and (2) when respondent had given clothing to Am. R.

¶ 29    Respondent never had overnight visits with the children and never progressed to unsupervised visitation.

¶ 30                                    b. Respondent's Testimony

¶ 31          Respondent testified that in November 2021, she moved in with a friend in Dallas, Texas. In April 2022, without notifying CHASI, she moved in with a cousin in Spring, Texas. Respondent explained her move to Texas as follows:

> "I didn't feel like I was safe in Rockford, and I wanted to show that I was willing to leave everybody and everything to get my kids back. I left everybody I knew, all my friends, and just started clean. And I've kept a job since I've moved out there."

On cross-examination, she further stated, "I had a crazy boyfriend who couldn't let go and kicked in my door a week before I left, so I didn't want him to find me. I just wanted to get away from everything."

¶ 32          After moving to Texas, respondent had returned to Rockford seven times, usually for a week at a time. She saw Am. R. at least once each time she visited. Prior to starting Zoom visits in September 2022, respondent had spent no more than 11 hours with Am. R. and visited Ah. R. only once.

¶ 33          Respondent testified that virtual visitation had not been offered to her until September 2022 and did not start until she texted Sanchez with an offer to pay for a visit with Ah. R. Respondent never missed those Zoom calls. She said she sent food by DoorDash to her children "quite frequently" and bought clothes for Am. R. or gave her "Sheen" [*sic*] cards.

¶ 34                                    c. The Trial Court's Findings

¶ 35          In February 2023, the trial court found that the State had proved all three allegations of unfitness listed in the petition—namely, that respondent failed to (1) make reasonable efforts to correct the conditions that were the bases for the removal, (2) make reasonable progress toward

the return of the children, and (3) maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare. The court explained as follows:

"[Concerning respondent,] when the children came into care, a number of services were recommended: *** among others, domestic violence counseling, substance abuse services, individual counseling, parenting, and cooperation. It is clear that, during the relevant 9-month periods, reasonable efforts and progress were not made.

The obstacles in this case that subverted the efforts and progress were, first and foremost, [respondent's] relocation to the state of Texas, making the providing of services that much more difficult. Compounding that within the state of Texas was [respondent's] reluctance to or failure to provide the caseworker with a location where she could then *** at least attempt to locate the proper services. [Respondent] did testify on her own behalf, but the Court does not find much of her testimony credible.

During the relevant 9-mont[h] periods that are alleged in the petition, *** she did not complete sufficient services to correct conditions. She did not graduate to unsupervised visitation even. The State has proven all three counts on both petitions as to mother by clear and convincing evidence."

¶ 36     2. *The Best-Interest Portion of the Termination Proceedings*

¶ 37     After making the fitness findings, the trial court immediately proceeded to the best-interest portion of the termination hearing. The court took judicial notice of the previous evidence and admitted CHASI's report of January 6, 2023, as an exhibit.

¶ 38          a. The Evidence Relating to Best Interest

¶ 39                                    i. *CHASI's Report*

¶ 40          CHASI's January 6, 2023, report described respondent as failing to cooperate with CHASI to arrange in-person visitation. She would notify CHASI of her presence in Rockford only after she had already arrived—often on the day she was leaving. Further, until August 2022, she had been texting the CHASI supervisor to report she was moving back to Rockford. CHASI had received "collateral" reports that respondent was using alcohol. The report noted she continued to return to Rockford despite "people in Rockford that want to kill her."

¶ 41          The report described the children as thriving in their respective placements. The foster parents were meeting the children's physical needs, taking them to appointments, and ensuring they went to school or daycare regularly. The foster parents also stated they would adopt the minors. Although Am. R. said she wanted to live with her mother, both children appeared happy in their placements. During the time Ah. R. had been in his third placement, he had unlearned "aggressive habits" of kicking.

¶ 42                                    ii. *The Statement of the Guardian* Ad Litem

¶ 43          Mary Cacciapaglia, the guardian *ad litem* (GAL), testified that during her most recent visit with Am. R., Am. R. indicated she felt safe, loved, and accepted in her placement. Am. R.'s placement was with the person she had always known as her paternal grandmother. DNA testing had excluded any genetic relationship, but the family relationships remained intact. Further, the foster parent was effective in advocating for Am. R.; for example, the foster parent was active in seeking out counseling for Am. R.

¶ 44          The GAL stated that Ah. R. was too young to interact much with her directly. However, she could observe that he seemed comfortable in his home. She had "no concerns with that placement."

¶ 45                                    iii. *Respondent's Testimony*

¶ 46          Respondent testified she had taken Am. R. and Ah. R. to Chuck E. Cheese the night before the hearing. She had also come to Rockford on January 16, 2023, for Am. R.'s birthday and taken her and her friends to a trampoline park. She (1) gave clothing to both children two or three months before the hearing, (2) sent food via DoorDash roughly every other week, and (3) had weekly Zoom visits with them that lasted two hours at a time.

¶ 47          Respondent testified that she had a good relationship with the children, and they were both excited when she visited.

¶ 48          Respondent believed she had made herself a better parent by "moving away from everyone" and "realiz[ing] the problems that were happening." She wanted to continue to use the services she was receiving through CHASI.

¶ 49                                    b. The Trial Court's Findings

¶ 50          The trial court concluded that termination of respondent's parental rights was in the best interest of Am. R. and Ah. R. The court explained as follows:

> "In [the report], [Am. R.'s] wishes are to be returned home to her mother. Although, she's very comfortable where she is now. So no one's saying there's no bond between this mother and these children. The question is what's in their best interest. ***
>
> *** It is clear from these factors that the children are comfortable in each of their placements. They are also bonded to those placements, as they are with their parent. Their placements have provided them structure, have allowed them to thrive, and have allowed them to grow.
>
> * * *

So[, in his current placement], [Ah. R.] has been able to unlearn *** his aggressive habits of kicking and supplement them with positive emotions. That's clearly a demonstration of growth.

[Respondent's] testimony, I'm sure, is laced with the best intentions of moving forward; but there was nothing in the testimony or the case presented by mother that contradicts any of these factors. In fact, I don't think they were even discussed during the testimony.

*** I do find it's more likely than not, by a preponderance of the evidence, to be in the best interest of these children to terminate parental rights, at this point, of [respondent and the fathers]. And I'm basing that on the report that's been filed; to some extent, even on [respondent's] testimony; and the proffer of the [GAL], which is corroborated by the report. There are very similar perceptions from the caseworker and the [GAL] that have come to the [c]ourt independently, and I think that adds to the weight of each of those."

¶ 51    Respondent appealed, and this court consolidated the cases for disposition.

¶ 52                                II. ANALYSIS

¶ 53    Respondent appeals, arguing that the trial court's (1) fitness determinations and (2) best-interest determinations in each case were against the manifest weight of the evidence. We disagree and affirm.

¶ 54                    A. The Fitness Determinations

¶ 55    Respondent challenges all three grounds on which the trial court found her unfit. However, we may affirm the court's "finding of unfitness as to any one of the alleged grounds." *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 11 (citing *In re C.W.*, 199 Ill. 2d 198, 217

- 10 -

(2002)). Accordingly, because we conclude that respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare, we address only that issue.

¶ 56                          1. *The Standard of Review*

¶ 57          A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29, 115 N.E.3d 102. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Id*.

¶ 58          2. *The Law Regarding Failure To Maintain Reasonable Interest*

¶ 59          A trial court may find a parent unfit under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2020) if adequate evidence exists the parent failed to "maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." The language of section 1(D)(b) is disjunctive; that is, a failure to maintain a reasonable degree of any of the section's prongs is individually a basis to find a parent unfit. *In re Y.F.*, 2023 IL App (1st) 221216, ¶ 34.

¶ 60          The analysis under section 1(D)(b) "does not focus on the parent's success, but rather the reasonableness of her efforts while considering her individual difficulties and circumstances." *Id.*, ¶ 34. However, "[a] parent's circumstances *** do not necessarily or automatically redeem a parent's failure to demonstrate reasonable interest, concern, or responsibility. *** [T]he question is whether a parent's then-existing circumstances provide a valid excuse." *In re M.I.*, 2016 IL 120232, ¶ 29, 77 N.E.3d 69. Furthermore, simply demonstrating some interest or affection toward a child does not make a parent fit or their efforts reasonable. *Y.F.*, 2023 IL App (1st) 221216, ¶ 34.

¶ 61          The supreme court wrote the following in *M.I.*:

" '[I]n determining whether a parent showed reasonable concern, interest or responsibility as to a child's welfare, [the trial court is required] to examine the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred. Circumstances that warrant consideration when deciding whether a parent's failure to personally visit his or her child establishes a lack of reasonable interest, concern or responsibility as to the child's welfare include the parent's difficulty in obtaining transportation to the child's residence [citations], the parent's poverty [citation], the actions and statements of others that hinder or discourage visitation [citation], and whether the parent's failure to visit the child was motivated by a need to cope with other aspects of his or her life or by true indifference to, and lack of concern for, the child [citation]. If personal visits with the child are somehow impractical, letters, telephone calls, and gifts to the child or those caring for the child may demonstrate a reasonable degree of concern, interest and responsibility, depending upon the content, tone, and frequency of those contacts under the circumstances. [Citations.] Also, mindful of the circumstances in each case, a court is to examine the parent's efforts to communicate with and show interest in the child, not the success of those efforts. [Citation.]

*** In a case proceeding under section 1(D)(b) of the Adoption Act, the issue is whether a parent maintained concern, interest and responsibility as to his or her child's welfare that, under the circumstances, was of a *reasonable* degree.' " (Emphasis in original.) *M.I.*, 2016 IL 120232, ¶ 28 (quoting *In re Adoption of Syck*, 138 Ill. 2d 255, 278-80, 562 N.E.2d 174 (1990)).

"[F]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's

welfare includes all situations when a parent's attempts are inadequate, 'regardless of whether that inadequacy seems to stem from an unwillingness or an inability to comply.' " *Y.F.*, 2023 IL App (1st) 221216, ¶ 45 (quoting *M.I.*, 2016 IL 120232, ¶ 26).

¶ 62　　　　　Examples of circumstances courts have recognized as supporting a finding of unfitness under section 1(D)(b) include noncompliance with an existing service plan (see *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24; see also *In re J.F.*, 248 Ill. App. 3d 1, 187, 618 N.E.2d 289 (1993); *In re S.J.*, 233 Ill. App. 3d 88, 598 N.E.2d 456 (1992)) and infrequent or irregular visitation that is the result of the parent's "voluntary decision making" (see *M.I.*, 2016 IL 120232, ¶ 31). A respondent who regularly misses visitations demonstrates a lack of interest in the child's welfare unless he or she has a "valid excuse" for those absences. *M.I.*, 2016 IL 120232, ¶¶ 26-31.

¶ 63　　　　　　　　　　　　　　3. *This Case*

¶ 64　　　　　Here, the trial court did not find respondent credible, concluding that respondent did not comply with the service plan or maintain a reasonable degree of interest in the children.

¶ 65　　　　　The trial court found that respondent never graduated to unsupervised visits. Further, during the roughly one-year period between respondent's moving to Texas and the termination proceedings, respondent had little contact with the minors, particularly Ah. R. Although respondent testified to visits to Rockford totaling approximately 7 weeks, her in-person visitation with Am. R., calculated charitably, totaled 11 hours. In the same period, she had a single in-person visit with Ah. R.

¶ 66　　　　　Sanchez testified that the barrier to respondent's making visits while she was in Rockford was her failure to give CHASI advance notice of her arrival. Sanchez said that Am. R.'s caregiver allowed visits that were not arranged through CHASI; this provides some explanation

for why respondent saw Am. R. so much more than Ah. R. Respondent admitted to Sanchez that she did not have any reason she was not regularly making phone calls.

¶ 67        Respondent participated in regular video visitation with Am. R. and Ah. R. after Sanchez arranged it in September 2022. Sanchez suggested such visits in spring 2022, but respondent did not arrange them.

¶ 68        The evidence shows a pattern of lack of interest and concern by respondent in her children. In particular, her neglect of Ah. R. is inexplicable by anything but a lack of care or concern. Respondent testified that she traveled from Texas to Rockford nearly monthly, usually driving, yet, despite this great effort, did not visit Ah. R. at all until after the goal change. Further, Sanchez's testimony suggests respondent's relative success in visiting Am. R. was the result of the caregiver's willingness to bend CHASI's rules. Respondent's visits were essentially at her convenience when she was in Rockford.

¶ 69        Respondent's visitation was irregular at best. Her circumstances, living in Texas to avoid people who wanted to harm her, might have arguably offered a "valid excuse" for her lack of in-person visits. See *M.I.*, 2016 IL 120232, ¶ 29. However, given her regular travel to Rockford, that argument must fail. Moreover, as we have noted, the trial court found respondent's testimony not to be credible.

¶ 70        Respondent claimed her difficulty in scheduling visits through CHASI was the result of her receiving her weekly schedule only days in advance. But respondent's own testimony is inconsistent with this explanation. She testified her employment was flexible and that she was generally able to arrange to travel to Rockford at the end of each month, usually for a week, but once for two weeks. Yet, she never alerted the caseworker to the likelihood of these visits. Moreover, Sanchez testified CHASI would learn that respondent was in Rockford only after she

had arrived, which respondent did not deny. Thus, the evidence showed that, despite respondent's willingness to travel, she was unwilling to follow CHASI's procedures to arrange regular visitation.

¶ 71 Respondent argues that the trial court relied entirely on her failure to comply with plan requirements to find she failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare. We disagree. As we have explained, the evidence tended to show that respondent lacked a valid excuse for her failure to (1) visit Ah. R. and (2) communicate regularly with Am. R. See *M.I.*, 2016 IL 120232, ¶ 29. Accordingly, we conclude that the State proved respondent's failure to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare by clear and convincing evidence, as found by the trial court.

¶ 72 B. The Best-Interest Determinations

¶ 73 1. *The Applicable Law and Standard of Review*

¶ 74 At the best-interest stage of termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71, 145 N.E.3d 605. In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors, which are derived from section 1-3(4.05) of the Act (705 ILCS 405/1-3(4.05) (West 2020)):

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes

- 15 -

and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32, 147 N.E.3d 953.

¶ 75 In contrast to the fitness portion of termination proceedings, at which the Illinois Rules of Evidence apply, "at the best interest portion of the termination hearing *** the trial court may consider 'all evidence helpful *** in determining the questions before the court *** even though that evidence would not be admissible in a hearing where the formal rules of evidence applied.' " *In re M.D.*, 2022 IL App (4th) 210288, ¶ 76, 193 N.E.3d 933 (quoting *In re Jay H.*, 395 Ill. App. 3d 1063, 1070, 918 N.E.2d 284, 289 (2009)).

¶ 76 A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in a superior position to view the witnesses and judge their credibility. *C.P.*, 2019 IL App (4th) 190420, ¶ 71. An appellate court "will not disturb the trial court's decision regarding a child's best interests *** unless it is against the manifest weight of the evidence." *Id.* ¶ 68. A best-interest determination is against the manifest weight of the evidence only when the opposite conclusion is clearly the proper result. *Id.*

¶ 77                    2. *This Case*

¶ 78 The trial court concluded that the preponderance of the evidence supported the conclusion that it was in the children's best interest to terminate respondent's parental rights. The court noted CHASI's January 6, 2023, report and the GAL's representations both suggested the children's placements would provide appropriate permanent homes for them, whereas

respondent's representations included no information relevant to the children's best interest. Both the GAL and the report stated the children were emotionally comfortable and physically and psychologically well provided for in their placement. The court deemed the report and the GAL's representations reliable because of their consistency with one another.

¶ 79          By contrast, respondent testified only to her bond with her children while saying nothing about how she could provide them with a safe, stable home. The trial court thus concluded that the preponderance of evidence supported the State's position.

¶ 80          We conclude that respondent has failed to show that the trial court's ruling was against the manifest weight of the evidence. The court was correct in concluding (1) that CHASI's January 6, 2023, report and the GAL's representations were consistent in stating that the children appeared to be thriving in their placements and (2) that respondent's testimony did not directly address how living with her would be in the children's best interest.

¶ 81          Respondent argues that the only evidence the trial court could consider was CHASI's January 6, 2023, report, which she contends is, although admissible, so argumentative, incomplete, inaccurate, and replete with signs of bias against her that it cannot support the court's ruling. But she has not explained how the court was wrong in considering the report in conjunction with the GAL's representations. Indeed, despite the court's reliance on the GAL's representations, respondent does not address those representations at all.

¶ 82                                    III. CONCLUSION

¶ 83          For the reasons stated, we affirm the trial court's judgment.

¶ 84          Affirmed.

- 17 -