2023 IL App (1st) 221216

SECOND DIVISION
March 14, 2023

No. 1-22-1216

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

|  |  |  |
|---|---|---|
| | ) | |
| IN THE INTEREST OF Y.F., | ) | Appeal from the |
|     Minor-Respondent-Appellee. | ) | Circuit Court of |
| | ) | Cook County |
| (PEOPLE OF THE STATE OF ILLINOIS, | ) | |
|     Petitioner-Appellee, | ) | |
| | ) | 16 JA 232 |
|     v. | ) | |
| | ) | Honorable |
| L.H., | ) | Jennifer Payne, |
|     Respondent-Appellant.) | ) | Judge Presiding |
| | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment and opinion.

## OPINION

¶ 1   L.H., the Respondent and mother of the minor at the center of this case, has struggled to be a good mother for her daughter, Y.F. Beginning in 2010, L.H. has been involved with the Illinois Department of Children and Family Services (DCFS) because the Department believed L.H. was neglecting Y.F. while struggling with substance abuse and mental health problems.

¶ 2   Despite numerous interventions and court supervision, the State eventually filed a petition for wardship in 2016, and Y.F. was made a ward of the court. For the next few years, DCFS, the State, and the court tried to reunite Y.F. with her mother. But L.H. continued to battle with substance abuse and struggled to develop healthy parenting skills.

¶ 3    In 2018, the State filed a petition for the appointment of a guardian with the right to consent to adoption, seeking to terminate L.H.'s parental rights because—among other reasons— L.H. failed to 1) maintain a reasonable degree of interest, concern or responsibility for Y.F. and 2) make reasonable efforts to correct the conditions which were the basis for Y.F.'s removal or failed to make reasonable progress toward Y.F.'s return. Four years later—which gave L.H. more time to improve the situation—the court held a hearing on her fitness. After the parties offered thousands of pages of evidence and two caseworkers testified, the trial court concluded that L.H. was unfit, and that it was in Y.F.'s best interest to terminate L.H.'s parental rights.

¶ 4    L.H. appeals. We, like the trial court did, have little doubt that L.H. cares for her daughter. But the court's conclusion that she did not show reasonable interest, concern or responsibility is not against the manifest weight of the evidence. The record is replete that L.H. could not stay sober, failed to fully engage with the parenting and therapy services she was offered and needed, and could not find a way to engage with her daughter in an appropriate way, eventually visiting her less and less as time went on. We thus affirm.

¶ 5                              BACKGROUND

¶ 6     Y.F. was born on February 28, 2010, to L.H., the appellant here, and A.F., her father. A.F. is not a part of this appeal.

¶ 7     A month after Y.F. was born, the DCFS investigated L.H. for a neglect. When L.H. showed up to a scheduled appointment (with her daughter in tow), L.H. was under the influence. A few months later, L.H. was found unconscious on the street, while Y.F. was unsupervised and in need of care. L.H. tested positive for PCP, and she was convicted of child endangerment.

¶ 8     A few years later, in November 2014, DCFS was again contacted when Y.F was found wandering the street wearing inappropriate clothing for the weather. L.H. was again

convicted of child endangerment, but Y.F. was still not removed from the home. In December 2015, paramedics responded to L.H.'s home because Y.F. was experiencing complications from a recent tonsillectomy. The paramedics found the home with no working heat or electricity, and a strong odor of cannabis permeated it. L.H. tested positive for drugs and again pleaded guilty to child endangerment.

¶ 9        In March 2016, the State filed a petition for wardship and a motion for temporary custody of L.H. At the time, L.H. admitted she had been using illegal drugs and was diagnosed with depression and bipolar disorders. Nor was she complying with services to help alleviate those conditions. The court took temporary custody of Y.F. in March, and in October 2016, adjudicated her neglected and abused based on a lack of care, living in an injurious environment, and being at a substantial risk of physical injury. At the subsequent dispositional hearing, the court found that L.H. was unable to care for Y.F., while her father, A.F., was unwilling to. The court made Y.F. a ward of the court and placed her under DCFS guardianship, with a permanency goal of returning Y.F. home within 12 months.

¶ 10        However, in June 2018, the court changed Y.F.'s permanency goal to substitute care pending a court determination on whether L.H.'s rights should be terminated. Eventually, the State filed a petition seeking the appointment of a guardian with the right to consent to adoption. The State alleged L.H. was an unfit parent because: (1) she had failed to maintain a reasonable degree of interest concern or responsibility for Y.F.; (2) she failed to make reasonable efforts to correct the conditions which were the basis for her daughter's removal; (3) she failed to make reasonable progress toward Y.F.'s return within any 9 month period after Y.F. was adjudicated neglected; and (4) she was unable to discharge her parental responsibilities because of mental impairment, illness, or retardation, and that inability would extend beyond a reasonable time. On

the third ground, the State alleged L.H. failed to make reasonable progress over five separate nine-month periods, beginning in October 2016 and running through July 2020.

¶ 11        In July 2022, the court held a hearing on the State's petition. The State withdrew its allegation that L.H. was unable to discharge her parental responsibilities due to mental impairment but proceeded on the first three grounds. At the hearing, two witnesses testified, and the parties admitted more than 3,000 pages of exhibits, mostly reports from the mother's therapists and other caseworkers. We summarize the relevant portions here.

¶ 12        When the court adjudicated Y.F. neglected in October 2016, DCFS created an integrated assessment for L.H. That assessment laid out the family history and set up service recommendations for L.H. The assessment noted that L.H. had significant and chronic substance abuse issues, and that she admitted using marijuana, PCP, alcohol, and crack cocaine on a regular basis. Beyond the assessment, there was evidence L.H. had used PCP and cocaine regularly for more than two decades. When interviewed, Y.F. noted that her mother has used drugs in front of her at times.

¶ 13        In addition to her struggles with addiction, L.H. also admitted she had a problem managing her anger and had hurt people before. A.F., the father, said that he applied for an order of protection against L.H. after she had tried to stab him in the head with a knife. Y.F. said she sometimes saw her mother and father fight and heard her mother argue with others. During her assessment, L.H. allegedly made general statements about wanting to harm the people who were responsible for Y.F.'s removal.

¶ 14        DCFS also expressed concern about L.H.'s approach to parenting; specifically, the agency believed she could not provide safe, stable, or proper supervision for her daughter. The assessment concluded that L.H. did not understand the negative impact of her behaviors on Y.F.,

and that she sometimes showed limited concern about her daughter's own negative behaviors.

¶ 15 The assessment concluded that L.H. needed to comply with her treatment programs, abstain from all substance abuse and participate in inpatient substance abuse treatment, have a psychiatric assessment, engage in individual therapy, obtain stable housing, and attend parenting classes. The assessment also recommended that L.H.'s visit with Y.F. be closely monitored and supervised.

¶ 16 Following the assessment, L.H. began to work on those goals. Veeta Love-Johnson, a DCFS caseworker who was assigned the case from March 2016 through October 2018, testified about L.H.'s progress. Love-Johnson said that L.H. had a significant history of mental health and substance abuse problems, including two prior psychiatric hospitalizations. After some initial hiccups, L.H. received and completed an inpatient treatment program at The Women's Treatment Center before moving on to an outpatient center. However, Love-Johnson said that L.H. relapsed and had to complete the inpatient treatment two or three more times because of relapses. Between May 2016 and March 2018, L.H. tested positive for illegal drugs at least 10 times.

¶ 17 Throughout 2017 and 2018, L.H. participated in numerous service plans, but her progress was often unsatisfactory. Although Love-Johnson did not remember some specifics, she said that she had concerns about whether L.H. was being consistent with her mental health treatment and taking her medications.

¶ 18 Although the court, in April 2017, gave DCFS the discretion to allow L.H. to have unsupervised visits with her daughter, Love-Johnson never felt comfortable allowing them. Love-Johnson said she was still concerned about the minor's safety and whether L.H. had progressed in both her sobriety and anger management services. Ultimately, DCFS did not allow

unsupervised visits because of L.H.'s repeated relapses with substance abuse and concern over whether L.H. was receiving consistent psychiatric care, Love-Johnson said.

¶ 19    In December of 2018, DCFS's Shannan Lewis took over the case. Lewis testified that L.H. was frequently difficult and resisted providing updates on her progress in therapy and treatment. Lewis said that she struggled to keep in consistent contact with L.H., and that when she did reach out to her, L.H. was evasive and expressed anger and frustration toward Lewis.

¶ 20    While L.H. visited with her daughter after she was removed, the visits became less and less frequent as proceedings went on. L.H. visited with her daughter in most months in 2017, 2018 and 2019, but did not visit her from April 2020 through November 2020. And in 2021, she only visited in February, April, and May. Between September 2021 and February 2022, there were no visits, either, because the agency was unable to contact L.H.

¶ 21    The State also offered into evidence reports about L.H. and Y.F.'s visits, as well as L.H.'s efforts in parental skills classes. A report from Mary and Tom Leo and Associates (MTLA), which gave L.H. and her daughter family behavioral therapy between May 2017 and 2018, was generally negative. The therapist reported that L.H. had refused instruction several times, was not interested in learning parenting techniques, and believed she did not need to continue with the sessions.

¶ 22    During the visits and when she interacted with Y.F., L.H. struggled to set appropriate limits and boundaries, requiring the therapist to intervene and get things back on track. Frequently, L.H. did not engage Y.F. positively or praise her, and she had trouble establishing an "age appropriate" relationship with her daughter. The therapist believed L.H. struggled to connect with Y.F. and sometimes would be aggressive in her tone. The therapist said that L.H. made limited attempts to demonstrate her love and care for her daughter, as well.

¶ 23    L.H. changed therapists in 2018, but her overall progress remained stagnant. For example, during a visit in April of 2018, Y.F. set up all the games for her and her mother to play, while L.H. sat down and did not say anything. Instead of playing with her daughter, L.H. seemed to play independently on her own, interacting with Y.F. very little. They did not speak often during the session, and L.H. seemed to struggle to encourage positive feelings in her daughter, the therapist noted. Love-Johnson said that while L.H. was participating in the family therapy sessions, she wasn't open to intervention, and that after completing the training, it wasn't clear L.H. had learned anything.

¶ 24    At the end of the evidence, the court declared L.H. unfit on two grounds: she failed to maintain a reasonable degree of interest, concern or responsibility in Y.F.'s welfare, and that she had not made reasonable progress toward reunification with Y.F. in four of the five charged 9-month time periods. (Although it did not expressly say so, it appears the court implicitly rejected the State's claim that L.H. had failed to make reasonable efforts to correct the conditions which were the basis of Y.F.'s removal.)

¶ 25    The court noted that L.H. clearly had a deep-rooted substance abuse problem and struggled mightily with it, along with other issues that impaired her ability to parent effectively. However, the court was concerned that L.H. had never achieved sobriety for more than a few months at a time, and that she seemed unable (or unwilling) to relate to Y.F. in any meaningful way. While the court noted that while L.H. made an effort, those efforts did not result in reasonable progress between July 2017 and July 2020.

¶ 26    The court said it did not doubt that L.H. loved her child, but that the State proved by clear and convincing evidence that L.H. was unfit. After a hearing on Y.F.'s best interests, the court terminated L.H.'s parental rights and appointed DCFS as guardian with the right to consent

to adoption. This appeal follows.

¶ 27                                    ANALYSIS

¶ 28        The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2022)) sets forth a two-step

process to involuntarily terminate a parent's rights. *In re M.I..* 2016 IL 120232, ¶ 20;705 ILCS

405/2-29(2) (West 2022). First, the State must prove, by clear and convincing evidence, that a

parent is "unfit" as defined by one of the grounds in section 1(D) of the Adoption Act. 705 ILCS

405/2-29(2), 750 ILCS 50/1(D) (West 2022). If the court finds a parent unfit, it must determine

whether it is in the child's best interest to terminate that parent's rights. 705 ILCS 405/2-29(2)

(West 2022).

¶ 29        The Adoption Act lays out numerous grounds by which a parent can be found unfit,

two of which are relevant here: grounds (b) and (m)(ii). 750 ILCS 50/1(D)(b), (m)(ii) (West

2022). When addressing this question, the parent's past conduct under the then-existing

circumstances is the only thing under scrutiny; we do not examine the best interests of the child

at this juncture. *In re Adoption of Syck*, 138 Ill. 2d 255, 276 (1990). Each case of parental

unfitness is *sui generis*, unique unto itself. *Id*. at 279.

¶ 30        A finding of unfitness will not be reversed unless it is against the manifest weight of

the evidence because the trial court's opportunity to view and evaluate the witnesses and

evidence is superior to that of a reviewing court. *M.I.*, 2016 IL 120232, ¶ 21. A decision is

against the manifest weight only when the opposite conclusion is clearly evident, or where the

finding is unreasonable, arbitrary, or not based on the evidence. *In re Nicholas C.*, 2017 IL App

(1st) 162101, ¶ 25. There is a strong and compelling presumption in the trial court's favor in

child custody cases. *Id.*

¶ 31        But while we are deferential to the trial court, we must be mindful that the right of a

parent to the care, custody and companionship of their children is perhaps one of the oldest fundamental liberty interests. *In re M.M.*, 2016 IL 119932 ¶ 26 (citing *Troxel v. Granville*, 530 U.S. 57, 64 (2000)). That said, when the trial court makes a finding of unfitness on one ground, we may affirm that finding regardless of the court's findings on the other grounds. *In re C.L.T.* 302 Ill. App. 3d 770, 772 (1999).

¶ 32    Before us, L.H. only challenges the court's conclusion she was unfit. She does not challenge to the court's finding that it was in Y.F.'s best interest that L.H.'s parental rights be terminated.

¶ 33    <u>Unfitness under ground (b)</u>

¶ 34    We begin with the court's determination that L.H. was unfit under ground (b) for failing to "maintain a reasonable degree of interest, concern or responsibility in the welfare of their child. 750 ILCS 50/1(D)(b) (West 2022). The language of ground (b) is disjunctive, meaning that failing to maintain a reasonable degree of any of the elements may be considered on its own as a basis to declare a parent unfit. *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24. This analysis does not focus on the parent's success, but rather the reasonableness of her efforts while considering her individual difficulties and circumstances. *Id.* But simply demonstrating some interest or affection toward a child does not make a parent fit or their efforts reasonable. *Id.*; *In re Jaron Z*, 348 Ill. App. 3d 239, 259 (2004).

¶ 35    When analyzing whether a parent is showing reasonable concern, interest or responsibility in their child's welfare, the court should consider the parent's difficulty in obtaining transportation to the child's residence, the parent's poverty, actions or statements that hinder or discourage visitation, and whether the parent's failure to visit the child was motivated by a need to cope with other aspect of her life or, rather, is an indication of true indifference to,

and a lack of concern for, the child. *Syck*, 138 Ill. 2d at 279.

¶ 36    L.H. points out that it is somewhat inconsistent that the court concluded that she made reasonable efforts under ground (m) (although not sufficient progress, as we discuss later), yet also found that she failed to maintain a reasonable degree of interest, concern or responsibility in Y.F.'s welfare. But the grounds for finding a parent unfit in Section (1)(D) of the Adoption Act stand independently of one another. *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 20.

¶ 37    And while the court found that the State failed to meet its burden to prove the Respondent unfit under ground (m)(i) in the five enumerated time frames the State picked, ground (b) has no time constraint. *Id.* ¶ 21. Under ground (b), the court may consider the entirety of a parent's conduct to determine if she is maintaining a reasonable degree of interest, concern, or responsibility in their child's welfare. *Id.* The court's conclusion that L.H. made reasonable efforts to try and correct the conditions which led to Y.F.'s removal does not undercut the court's finding that L.H. failed to maintain a reasonable degree of interest, concern or responsibility in Y.F.'s welfare. A parent may make reasonable progress at correcting the underlying condition that led to the child's removal but languish in keeping an interest, concern or responsibility in the child's welfare at the same time.

¶ 38    The latter is what the court concluded happened here, and the opposite conclusion is not plainly apparent. There is substantial evidence in the record that L.H. struggled to keep up with and use the services she was offered, could not stay sober, and at time lost touch with service workers for significant periods of time. Evidence of noncompliance with an imposed service plan, coupled with continued struggles to maintain sobriety, can support a finding of unfitness under ground (b). *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24. Here, we have evidence of both supporting the trial court's conclusion. See *Jaron Z.*, 348 Ill. App. 3d at 259.

¶ 39    The trial court was particularly concerned with L.H.'s inability to stay sober. She tested positive for illegal substances at least ten times from the time between Y.F. was adjudicated neglected through 2017. Even after that point, L.H. admitted using illegal substances or alcohol, and therapists and caseworkers often noted that they believed she was under the influence of one kind of substance or another when they spoke with her. She sometimes showed up to appointments appearing under the influence. Achieving sobriety—or even inching closer to it—was critical if L.H. was to show some responsibility for Y.F.'s welfare. This is particularly true here, where the incidents that led to DCFS's involvement were L.H.'s lack of sobriety while taking care of Y.F.

¶ 40    Along those lines, L.H. also had a responsibility to manage her mental health. There is evidence that, at a minimum, L.H. may have suffered from depression and bipolar disorder. It was incumbent upon her, then, to meet with her psychiatrist regularly and keep up with her medications. There is evidence she did neither, further buttressing the court's conclusion that L.H. was not taking reasonable responsibility for Y.F.'s welfare. See *Daphine E.*, 368 Ill. App. 3d 1052, 1065 (2006).

¶ 41    Then there is the question of L.H.'s parenting patterns and anger issues. While the spectrum of acceptable parenting is wide, numerous service providers expressed worry that L.H. did not have a healthy relationship with Y.F. and sometimes showed "minimal concern" about her daughter's behaviors. L.H. often treated her daughter more as a peer than a child and did not complete all the required anger management and domestic violence programs she was asked to undertake. See *In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 51 (no basis to conclude court's finding of unfitness was against manifest weight of evidence when parent did not comply with required goals in service plans.) L.H.'s anger issues are particularly worrisome; there was evidence she

had been inappropriately physical with Y.F. before, not to mention the father's allegation that L.H. once attacked him with a knife. But L.H. did not fully participate in the anger management and parenting courses she was assigned. These skills were critical to ensure L.H. could be responsible for Y.F.'s welfare, and failing to embrace them is evidence L.H. was not reasonably interested in or being responsible for Y.F.'s welfare. See *Daphine E.*, 368 Ill. App. 3d at 1065-66.

¶ 42    The record also shows that L.H. seemed disinterested in learning how to be a better parent for Y.F., and that indifference came through in her visits with her daughter. In addition to her relapses, L.H. was unwilling to try to change her parenting behaviors to better care for and meet Y.F.'s needs. At times, she refused to consider other parenting techniques and instead believed that since she had been raised a particular way, that was the only way to parent her daughter. Yet, caseworkers and therapists noted that when they were together, Y.F. and L.H. sometimes struggled to have positive, nurturing interactions.

¶ 43    Additionally, as time went on, L.H.'s visits with her daughter become less frequent. First, L.H. visited weekly, then only monthly. L.H. only missed visiting her daughter a few months in 2018 and 2019, but she missed visiting with Y.F. in eight straight months in 2020 (which we caveat by recognizing that the COVID-19 pandemic had just begun, perhaps limiting in-person visitation). And then, in 2021, L.H. visited her daughter less than she had in any year since she was first removed from her custody. In 2020 and 2021, the caseworker struggled to reach L.H., and also set up visits for her. Infrequent visits are an indication a parent is not showing reasonable interest, concern or responsibility in their child. See *In re M.I.*, 2016 IL 120232, ¶ 36; *In re C.D.*, 2020 IL App (3d) 190176, ¶ 36. While there is evidence that when she did visit her daughter, L.H. spent quality time with her, that does not make up for fewer and

fewer visits.

¶ 44    L.H. points out, however, that there is conflicting evidence in the record. One of the caseworkers who watched her interact with her daughter noted that L.H. treated Y.F. lovingly, desired to be reunited with her, expressed an interest in how she was doing, and clearly cared for her. There is also evidence L.H. prepared food for her daughter when she visited and gave her gifts even though she was of limited means. This may weigh in favor of the mother, but it is not our job to re-evaluate the evidence. The trial court is in the best position to sort out the chorus of conflicting voices, hence our deference to it. *Nicholas* 2017 IL App (1st) 162101, ¶ 25. And under the manifest-weight standard, we will not reverse the trial court's judgment even if we might have ruled differently. *In re S.K.B.* 2015 IL App (1st) 151249, ¶ 28.

¶ 45    Indeed, L.H. did not disappear or abandon her daughter entirely. But a parent is not fit merely because they have shown some interest or affection for the child. *Tr. A.*, 2020 IL App (2d) 200225, ¶ 50. Rather, the test is an objective one. *In re M.J.*, 314 Ill. App. 3d 649, 657 (2000). There is evidence in the record that L.H. struggled to find transportation to go to therapy sessions, and unquestionably her struggles with mental illness, addiction, and poverty contributed to her situation. But failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare includes all situations when a parent's attempts are inadequate, "regardless of whether that inadequacy seems to stem from an unwillingness or an inability to comply." *M.I.*, 2016 IL 120232, ¶ 26.

¶ 46    Here, L.H. struggled to maintain sobriety or keep taking her prescribed medications, relapsed regularly, used alcohol, and sporadically visited her daughter. She also did not meaningfully engage with the parenting services she was offered, and when given a chance to interact with Y.F., continued to demonstrate either indifference or inappropriate behaviors.

Failing to comply with an imposed service plan, a continued addiction to drugs, repeated failure to obtain treatment for addiction, and infrequent or irregular visits with the child have all been sufficient to uphold a finding of unfitness under ground (b). *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24; see also *M.I.*, 2016 IL 120232, ¶ 36 (evidence of father's sporadic visitation sufficiently warrants finding of unfitness.) Looking at the evidence, the trial court's conclusion that L.H. did not maintain a reasonable degree of interest, concern or responsibility in Y.H.'s welfare is not against the manifest weight of the evidence.

¶ 47 Since we conclude the court's finding of unfitness on ground (b) is not against the manifest weight of the evidence, we need not consider the mother's argument that the court's finding on ground (m)(ii) was erroneous. See *M.I.*, 2016 IL 120232, ¶ 43. A parent's right's may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence. *In re Gwynne P.*, 215 Ill.2d 340, 349 (2005). We thus affirm the trial court's judgment.

¶ 48 CONCLUSION

¶ 49 The judgment of the circuit court is affirmed.

¶ 50 Affirmed.

*In the Interest of: Y.F., a Minor*, **2023 IL App (1st) 221216**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16 JA 232; the Hon. Jennifer Payne, Judge, presiding. |
| | |
| **Attorneys for Appellant:** | Sharone Mitchell Jr., Cook County Public Defender, of Chicago (Suzanne A. Isaacson, Assistant Public Defender, of counsel), for Appellant. |
| | |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Gina DiVito, and Victoria L. Kennedy, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Kass A. Plain, and Carrie Fung, of the Office of the Cook County Public Guardian, of Chicago, for Minor-Appellee. |