2023 IL App (1st) 221779-U

SECOND DIVISION
August 8, 2023

No. 1-22-1779

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| IN THE INTEREST OF: M.G., a minor, | ) | |
| | ) | |
| Respondent-Appellee | ) | Appeal from the |
| | ) | Circuit Court of |
| (PEOPLE OF THE STATE OF ILLINOIS, | ) | Cook County |
| | ) | |
| Petitioner-Appellee, | ) | 18 JA 1074 |
| | ) | |
| v. | ) | Honorable |
| | ) | Maxwell Griffin, |
| Michael G., | ) | Judge Presiding |
| | ) | |
| Father-Respondent-Appellant.) | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Court's unfitness and best-interest findings were not against manifest weight of evidence.

¶ 2    This case involves the termination of Michael G.'s parental rights over his minor daughter. (As father and child share the same initials, and to protect the parties' privacy, we will refer to the "Child," "Mother," and "Father" by those titles only.) Nearly two years after Child was brought under DCFS protection, Father finally reached out to the agency caring for her. By

that time, however, the State had already moved to terminate his rights based on his lack of participation in Child's life.

¶ 3   After extensive evidentiary hearings, the circuit court concluded that Father was unfit for several bases asserted by the State, and it was in Child's best interest to terminate his parental rights. Father now appeals that decision. While we are sympathetic to this difficult situation, under our deferential standard of review, we find no basis to overturn either of the trial court's decisions and thus affirm.

¶ 4                                    BACKGROUND

¶ 5    As an initial matter, this appeal was previously consolidated with Mother's appeal—case number 1-22-1830. But during briefing, Mother's counsel filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), which this court granted on June 27, 2023. We severed the cases so Father could proceed with his freestanding appeal. We state only those facts necessary to understand the proceedings as they relate to Father and Child.

¶ 6    At all relevant times, Father has been a resident of Iowa. In early 2017, Child was born out of an extra-marital affair between Father and Mother. (Father was married; Mother was not.) For the first few weeks of Child's life, the parents spent time together caring for Child. However, around the time Child was a month old, Mother and Child moved to Chicago without Father. (He remained in Iowa with his wife and other children.)

¶ 7    For the rest of 2017, Mother and Father stayed in regular contact with each other via telephone and social media; Father would inquire about his daughter. He also sent Mother money and supplies when needed. But in January 2018, Mother changed her phone number, shut down all social media, and moved to Oklahoma without telling Father—effectively cutting him off. By all accounts, Father had no contact with, or information about, Mother or Child until he was

informed that Child was in the care of Illinois DCFS. (Child, and her half-siblings, were brought under DCFS custody in November 2018 after Mother was charged with child abuse in Oklahoma. Ultimately, she was convicted of enabling child abuse and imprisoned from July 2019 to January 2022.)

¶ 8    Father admits he was present, by telephone, at a child and family meeting in December 2018, where he was told that Child was under the care of DCFS and One Hope United, the case service agency here in Chicago. He would not re-engage with the case until August 2020. During Father's absence, the State attempted to locate him but could not, as it had very little information about him. Father testified that, during this time, he made efforts to reconnect with his daughter but was unable due to financial and familial difficulties.

¶ 9    In January 2020, before Father had reconnected with the case, the State filed a joint petition to terminate both parents' parental rights. As to Father, the petition alleged abandonment; failure to maintain a reasonable degree of interest, concern, or responsibility; desertion; failure to make reasonable efforts to correct the conditions that led to removal and make reasonable efforts for the child's return; and evidence of intent to forgo parental rights. See 750 ILCS 50/1(D)(a), (b), (c), (m), (n) (West 2020). As of January 2020, the permanency goals for Child were changed to termination of parental rights with the goal of permanent placement with her current foster family.

¶ 10    In August 2020, Father finally made contact with Mercedes Hunter, Child's case worker at One Hope. After contact, he immediately requested visitation. However, as he had not been a part of Child's life for so long, it took several months before One Hope granted the request. Hunter explained that this delay was necessary to prepare Child for the impact of meeting her biological father.

¶ 11    As part of the reunification, Father needed to be assessed to determine what services he'd require to complete the process. While the record is quite hazy on specifics, we know that it took nearly a year for Father to complete the assessment. One Hope's records show that Father missed several scheduled assessments in early 2021. Father acknowledged this and testified that he had to work, or simply "forgot." In any event, he completed the assessment in October 2021.

¶ 12    According to the assessment, Father needed therapy, parent coaching, and possible family therapy with Child. Unfortunately, Father never completed these recommended services. But as the court would later acknowledge, it was not his fault. The testimony was clear that the services available in Iowa were insufficient to meet the assessment requirements. Additionally, because of licensure restrictions, the Illinois service providers were prohibited from working with out of state clients/patients such as Father.

¶ 13    By all accounts, after re-entering the case, Father regularly engaged with Child. He had regular video calls with her, purchased gifts, and had one face-to-face visit with her. He also voluntarily participated in several meetings in 2021. There is no evidence to suggest that Father's contact with Child was anything other than appropriate, patient, and loving.

¶ 14    Despite his engagement, in 2022, the court held a bifurcated hearing on the State's petition to terminate parental rights—addressing both unfitness and best interests.

¶ 15    During the unfitness portion of the hearing, the court heard testimony from several witnesses; much of which related to the State's petition against Mother. Relevant to Father, the court heard testimony from Hunter; her supervisor, Samantha Smith; Mother; and Father himself. Other than testifying to the facts as we have laid out, the most relevant portion of this hearing came from Father's testimony. He specifically acknowledged that Mother told him to "come and

get your baby" in 2018. After prodding, he admitted that he was told this when he participated, by telephone, in the December 2018 child and family meeting.

¶ 16    At the conclusion of the unfitness hearing, the court entered its oral findings. As to Father, the court found the State had met its burden on all but the ground of abandonment. The court acknowledged that since coming forward, Father has made significant efforts to stay in Child's life. However, the crux of the ruling was that:

"I think it's fair to say that [Father] has come forward; that does not excuse the absence for most of his child's life of [Father]. And as I believe I noted earlier, that there's credible testimony and evidence that he knew or should have known this child was in the child welfare system here in Illinois as early as December of 2018 since there's evidence that he was called for a child family team meeting."

¶ 17    The court continued:

"There was no reason outside his control for him not being involved with this child *** much earlier in her time in our system. And his failure to step forward had more to do with instability in his life and issues that he was going through which, while the Court can be understanding of that, I must be focused on the child's life and whether or not the parent is able to or working towards being able to provide a safe and stable home for the child and to develop a relationship, a meaningful relationship during meaningful times in the child's life with the child, and I find an utter failure to do so here."

¶ 18    Having found unfitness, the court moved on to the question of whether it was in Child's best interests to terminate Father's parental rights. The testimony revealed that Child's foster parents have provided a safe, caring, and appropriate environment since she was about 2. At the

time of the hearing, Child was approximately five and was well bonded with her foster parents. There was no evidence of neglect or any behavioral or psychological concerns. According to Hunter, Child has stated, of the foster parents, "that's mommy and daddy. She said I'm not moving from mommy and daddy. I want mommy and daddy." One Hope's recommendation was to terminate Father's rights and allow adoption by the foster parents.

¶ 19    Father, for his part, acknowledged his past failings. He explained that he "had a lot going on in my life." However, to his credit, he repeatedly acknowledged that he "had no excuse." He testified that he loves Child and thinks it would be in her best interest to be with her real father and family.

¶ 20    On best interests, the court found that Child's foster home was "loving and caring. [She] has been provided for. And these foster parents are willing to provide permanency and a forever home for [Child], something which [she] deserve[s] and something which the Court is charged with making sure that [she] get[s]." After stating that the court had "looked at all the factors involved in best interest hearings," it found that it was in Child's best interests to terminate Father's parental rights. Father timely appealed.

¶ 21                               ANALYSIS

¶ 22    Before this court, Father challenges both the court's unfitness and best-interest findings. Termination of parental rights is a two-step process. *In the Interest of Y.F.*, 2023 IL App (1st) 221216, ¶ 28. First, the State must prove, by clear and convincing evidence, that a parent is "unfit" as defined in Section 1(D) of the Adoption Act. *Id.*; see also 705 ILCS 405/2-29(2), 750 ILCS 50/1(D) (West 2022). If the court finds unfitness, it must then determine whether terminating parental rights is in the best interest of the child. *Id.*; see also 705 ILCS 405/2-29(2) (West 2022). As such, we begin with unfitness.

¶ 23                                    I. Unfitness

¶ 24     There are several grounds on which a court may declare a parent "unfit." 750 ILCS

50/1(D) (West 2022). A finding under one of these grounds will not be reversed unless it is

against the manifest weight of the evidence, meaning "the opposite conclusion is clearly evident"

or "the finding is unreasonable, arbitrary, or not based on the evidence." *Y.F.*, 2023 IL App (1st)

221216, ¶ 30. We afford great deference to the trial court's decision. *In re Nicholas C.*, 2017 IL

App (1st) 162101, ¶ 25. There is a "strong and compelling" presumption in favor of the result

reached by the trial court in these cases. *Y.F.*, 2023 IL App (1st) 221216, ¶ 30; *Nicholas C.*, 2017

IL App (1st) 162101, ¶ 25.

¶ 25     When, as here, the court makes findings under several grounds, we need only find one is

appropriate to affirm the finding of unfitness, regardless of the court's findings on the others.

*Y.F.*, 2023 IL App (1st) 221216, ¶ 47; *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). In

this case, we focus on ground (b): a "Failure to maintain a reasonable degree of interest, concern

or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2020). The language in

this section is disjunctive, meaning "the failure to maintain a reasonable degree of interest *or*

concern *or* responsibility as to the child's welfare—may be considered on its own as a basis in

determining whether the parent is unfit." *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24. We do

"not focus on the parent's success, but rather the reasonableness of [their] efforts while

considering [] individual difficulties and circumstances" (*Y.F.*, 2023 IL App (1st) 221216, ¶ 34),

such as poverty and transportation problems (*In re J.O.*, 2021 IL App (3d) 210248, ¶ 36), or "the

need to resolve other life issues." *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31.

¶ 26     A parent is not fit simply because they have demonstrated *some* affection or interest

toward their child. *Y.F.*, 2023 IL App (1st) 221216, ¶ 34. There is no doubt that many cases

involve dueling facts that "tend to demonstrate an unreasonable degree of interest, concern, or responsibility during some time periods, yet also show a reasonable degree in other[s]." *J.O.*, 2021 IL App (3d) 210248, ¶ 36. This is one such case. Nobody doubts that Father has attempted to redeem himself and establish a connection with Child. But neither can it be disputed that for a very long stretch of time—nearly two years—he made no contact whatsoever with Child. In such a case, it's up to the trial court to determine whether the overall degree of interest, concern, or responsibility was reasonable. *Id.*

¶ 27 By far the circuit court's principal concern was Father's utter failure to engage with this case from December 2018 to August 2020. While Father explained that he tried to "search" for Child during this time, he admitted that he was told in December 2018 that she was in the care of DCFS in Illinois. More pointedly, he even participated in a child and family meeting with the very agency in charge of her case. As the State puts it before this court, there was no more need to "search" for her—he *knew* where she was (or at least how to locate her).

¶ 28 We appreciate that, during that nearly two-year window of time, Father was struggling to keep his own family in Iowa together, but he did so at the complete expense of engaging with Child in any way. Despite his regular and sincere attempts to be part of Child's life later, the circuit court was not required to overlook his failure to do so at such a critical point in her life. See *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 27 (despite praising mother for maintaining contact and interest with children, the court "simply could not ignore the critical point of this cause.")

¶ 29 Given the competing periods of interest, concern, or responsibility, it was the trial court's job to resolve whether the totality of the circumstances warranted a finding of unfitness. See *J.O.*, 2021 IL App (3d) 210248, ¶ 36. We are in no position to say that the court's finding of

unfitness was so arbitrary or unreasonable that the opposite conclusion was clearly evident. See

*Y.F.*, 2023 IL App (1st) 221216, ¶ 30. We thus uphold the finding of unfitness.

¶ 30                                    II. Best Interests of the Child

¶ 31    The finding of unfitness affirmed, we now turn to whether termination was in Child's

best interest. *Y.F.*, 2023 IL App (1st) 221216, ¶ 28. At this stage of the termination hearing, the

focus shifts from " 'the parent's interest in maintaining the parent-child relationship' " to " 'the

child's interest in a stable, loving home life.' " *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 41

(quoting *In re D.T.*, 212 Ill. 2d 347, 364 (2004)). The court's goal is ensure the child's welfare

and determine whether termination would improve the child's "financial, social, and emotional

atmosphere." *Daphnie E.*, 368 Ill. App. 3d at 1071.

¶ 32    In making the best interest determination, the court is required to consider several

statutory factors. See 705 ILCS 405/1-3(4.05) (West 2022). The court may also "consider the

nature and length of the child's relationship with her present caretaker and the effect that a

change in placement would have upon her emotional and psychological well-being." *In re

Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 33    Unlike unfitness, the State is only obligated to prove best interests by a preponderance of

the evidence. *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 41. When the parent is challenging the

sufficiency of the best-interest finding, we review the court's decision to determine whether it is

against the manifest weight of the evidence. *Daphnie E.*, 368 Ill. App. 3d at 1072

¶ 34    As the State notes, Father's argument is basically: "[Child] needs her father." The focus

on his argument was what he *could* provide. And while everyone acknowledged that he had been

diligent more recently in trying to form a relationship with Child, he was doing just that—

*forming* a relationship. At the time of the hearing, she already had a clearly established bond with

her foster parents, who undeniably provided her with a loving, caring environment. As Child put it, according to Hunter: her foster parents are "mommy and daddy. She said I'm not moving from mommy and daddy. I want mommy and daddy." Because of the strength of this bond, and despite Father's efforts, Hunter unequivocally testified that it was in Child's best interests to terminate Father's rights and allow the foster parents to adopt. There is more than enough evidence in the record to conclude that it was in Child's best interests to terminate father's right and allow her to be adopted by her foster parents.

¶ 35    As such, we affirm the court's best-interests finding as well.

¶ 36                                CONCLUSION

¶ 37    The judgment of the circuit court is affirmed in all respects.

¶ 38    Affirmed.