2026 IL App (4th) 260267-U

NOS. 4-26-0267, 4-26-0268, 4-26-0269 cons.

<table>
<tr><td>NOTICE<br>This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).</td><td>IN THE APPELLATE COURT<br><br>OF ILLINOIS<br><br>FOURTH DISTRICT</td><td>FILED<br>June 22, 2026<br>Carla Bender<br>4th District Appellate<br>Court, IL</td></tr>
</table>

| | | |
|---|---|---|
| *In re* Miy. R., Mal. R. and Mia. R., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
| Petitioner-Appellee, | ) | Nos. 23JA57 |
| v. | ) | 23JA58 |
| Michael R., | ) | 23JA59 |
| Respondent-Appellant). | ) | |
| | ) | Honorable |
| | ) | John Brian Goldrick, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Lannerd and Vancil concurred in the judgment.

**ORDER**

¶ 1     *Held*:     The appellate court affirmed the trial court's finding that respondent was unfit for failure to maintain a reasonable degree of interest, concern, and responsibility as to his children's welfare where he completed no services and attended no visits for more than a year.

¶ 2     Respondent, Michael R., is the father of three children involved in this appeal: Miy. R., Mal. R., and Mia. R. The State filed a petition to terminate respondent's parental rights to the three children for failure to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2024)). The trial court ruled that respondent was unfit and that it was in the children's best interest to terminate his parental rights. The court then entered an order terminating his parental rights. Respondent appeals the order finding him unfit. We affirm.

¶ 3                                    I. BACKGROUND

A. Petition for an Order of Protection

¶ 4        On June 6, 2023, the children's mother, Lakeia B., completed a petition for an order

of protection against respondent (the petition indicates that it was filed on both June 6, 2023, and

June 8, 2023). According to Lakeia, as she was exiting her vehicle, respondent said he would

"pu[n]ch or [k]nock [her] out." Lakeia alleged that respondent was "always hittin[g] [her] with

things," including table legs, belts, boots, shoes, and his hands. She indicated that respondent

threatened to kill her and said she was "scared for [her] life." She alleged that respondent once

"busted [her] head open" and that she had marks "all over [her] body [from] head to feet." She

asserted that respondent "does these things to [her] daily or ever[y] other day."

¶ 5                              B. Petition for Adjudication

¶ 6        On June 7, 2023, the State filed a petition for adjudication of wardship for all three

minors, alleging that they were neglected in that they were living in an environment injurious to

their welfare because (1) Lakeia "has unresolved issues of domestic violence and/or anger

management" that "creates a risk of harm to the minors" and (2) respondent "has unresolved issues

of domestic violence and/or anger management" that "creates a risk of harm to the minors." See

705 ILCS 405/2-3(a)(b) (West 2022).

¶ 7                                C. Shelter Care Hearing

¶ 8        A shelter care hearing was held on June 8, 2023. At that hearing, the trial court

reviewed Lakeia's petition for an order of protection, alleging that she was threatened and beaten

by respondent on June 6, 2023, and May 18, 2023. Police incident reports were included with the

petition. The court determined that, based on the police reports and the sworn and verified petition

for an order of protection, "there is domestic violence going on between the mother and

[respondent] in this case." The court found "probable cause" and an "immediate and urgent necessity to remove these minors from the home." The court entered an order granting temporary custody of the minors to the guardianship administrator of the Illinois Department of Children and Family Services (DCFS), with authority to place the minors.

¶ 9                                             D. Adjudicatory Hearing

¶ 10        On September 5, 2023, the trial court held an adjudicatory hearing. At the hearing, Lakeia admitted to the allegation in the petition for adjudication of wardship that the minors were neglected in that they were living in an environment injurious to their welfare because she had "unresolved issues of domestic violence and/or anger management" that "create[d] a risk of harm to the minors." The allegation against respondent was dismissed. The State provided the following factual basis for the admission:

> "On June 6th of 2023 at the courthouse, officers spoke with [Lakeia] and observed injuries to her that were both fresh and healed injuries. She explained to them that she was the victim of domestic violence with [respondent]. On 6/8 of 2023, in a verified petition for order of protection, [Lakeia], in the narrative section, described being hit with a table leg, belt, and [respondent]'s hands."

¶ 11        The trial court found a sufficient factual basis and that Lakeia's admission was knowing and voluntary. The court adjudicated the minors neglected and set the matter for a dispositional hearing.

¶ 12                                            E. Dispositional Hearing

¶ 13        On October 3, 2023, the trial court held a dispositional hearing. There is no transcript of the hearing in the record. However, there is a dispositional order. In the order, the court made the children wards of the court and found respondent

"unfit *** to care for, protect, train, educate, supervise or discipline the minor(s) and placement with him is contrary to the health, safety and best interests of the minor(s) because he needs to cooperate, visit, complete parenting class, counseling services, [domestic violence] treatment, be assessed for substance misuse and complete recommended treatment."

¶ 14                              F. Permanency Review Hearings

¶ 15        The trial court held six permanency hearings from January 16, 2024, to August 14, 2025. At the first hearing, on January 16, 2024, respondent was present. The court found that he was unfit and had made reasonable efforts but not reasonable progress toward returning the minors home. At the next permanency review hearing, on May 14, 2024, respondent appeared but then left the courtroom before the hearing ended. The court found respondent had not made reasonable progress or efforts toward returning the minors home and remained unfit.

¶ 16        Respondent did not appear at the next four permanency hearings on September 10, 2024, December 3, 2024, April 1, 2025, and August 14, 2025. At each hearing, the trial court found respondent had not made reasonable progress or reasonable efforts toward returning the minors home and remained unfit. At the hearing on December 3, 2024, the court ordered that "[Lakeia] is to have no contact with [respondent]." The court also ordered that the minors were to have no contact with respondent unless he went through the DCFS agency to obtain supervised visits.

¶ 17                               G. Petition to Terminate

¶ 18        On April 11, 2025, the State filed a petition to terminate respondent's parental rights, alleging that "[h]e has failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare." See 750 ILCS 50/1(D)(b) (West 2024).

¶ 19                               H. Fitness Hearing

¶ 20		The trial court held a fitness hearing on November 6, 2025. Respondent appeared in court in the custody of the McLean County Sheriff's Office.

¶ 21		1. *Hannah Snook's Testimony*

¶ 22		The first witness to testify was Hannah Snook, a child welfare specialist for Lutheran Social Services of Illinois and the caseworker for the minors. Snook had been the caseworker from July 31, 2023, until the time of the fitness hearing, except for three months from October 2024 to January 2025, when she was on maternity leave. Snook testified that the minors came into care because of "domestic violence" between the minors' mother and respondent.

¶ 23		Snook first met respondent on November 20, 2023, and explained what he needed to do to have his children returned to him. Respondent completed an integrated assessment, which led to a client service plan that required him to cooperate, obtain stable housing, refrain from domestic violence and substance abuse, obtain mental health treatment and parenting education, be employed, and regularly visit his children.

¶ 24		The first time respondent was evaluated for his service plan, in December 2023, he was rated as "satisfactory" because "[h]e was doing what he was supposed to." He obtained a substance abuse assessment at Chestnut Health Systems (Chestnut), started attending domestic violence classes, and received some mental health services. However, respondent disengaged from services at Chestnut on June 13, 2024, refusing further treatment against staff advice. He was also discharged from his domestic violence class for failure to appear and discharged from mental health services because he was not "applying it to his life" and became "inconsistent and uncooperative." Snook testified respondent was not consistent with visitation and last visited his children on September 30, 2025. There was a time when respondent refused to visit with his children because "he had issues" with Snook. Respondent had no visits with his children from

January 2024 to May 2025. According to Snook, respondent was entitled to weekly visitation for most of that period.

¶ 25        On February 5, 2024, respondent told Snook he was refusing to visit his children and comply with services and "that pretty much he doesn't care." In April 2024, Snook reached out to respondent, and he again said he was not going to comply with services. At that time, respondent had not seen his children in months because of his own choice, according to Snook. To Snook's knowledge, respondent did not send letters, cards, e-mail messages, or gifts to his children.

¶ 26        When Snook returned from maternity leave, she learned that respondent had been arrested and was in the Tazewell County jail from December 28 to 30, 2024. Snook obtained phone records from the jail and found 88 phone calls had been made from respondent to Lakeia during that three-day period. Snook explained that while 88 phone calls were made, only 72 were answered and "completed." Snook listened to some of the calls and was able to confirm that it was Lakeia who was on the phone with respondent. According to Snook, the parties did not discuss the minors in any of the phone calls she listened to.

¶ 27        Snook testified that respondent never provided her with an address where he was living. Respondent completed a substance abuse assessment, and no further treatment was ordered. He also completed parenting classes. Snook described respondent's employment as "rocky," indicating that she never received proof of his employment. Respondent completed a mental health assessment and was recommended for counseling but was discharged due to lack of attendance. Snook testified that respondent was verbally aggressive and threatening to her and not willing to engage with her or other agency staff.

¶ 28        Respondent was transferred from the Tazewell County jail to the McLean County

jail on December 30, 2024. Snook did not know how long he stayed there. Respondent made phone calls to Lakeia from the McLean County jail, but Snook did not listen to them. Before Snook went on maternity leave, she and respondent had a breakdown in communication that continued until May 2025. Snook testified that it was respondent's choice not to have visits with his children and not to cooperate during that time. Snook stated that she tried to have contact with respondent and that her phone number had always been the same. Respondent used aggressive and intimidating language with Snook, including profanity.

¶ 29        Snook testified that respondent's visits with his children were restricted on February 1, 2024, because of his actions and lack of engagement. Visits resumed in May 2025, after respondent began to engage again and a family team meeting was completed. Respondent's visitation was suspended from February 2024 to May 2025 because "he indicated he wasn't going to visit."

¶ 30                    2. *Respondent's Testimony*

¶ 31        Respondent testified that this case started based on allegations of domestic violence between himself and Lakeia that ended with him pleading guilty to domestic battery. Respondent was sentenced to probation for that crime. Respondent testified that in this case, he "was given [a] court order to complete the domestic violence class, assessments for substance abuse, assessments for mental health counseling and to maintain stable housing, to maintain work to show that [he is] able to support [his] children." He testified that he completed his assessments successfully and started classes and was cooperating until he and Snook stopped "seeing eye to eye." He said that occurred in February 2024, which was his last visitation with his children for many months. He agreed that discussions between himself and Snook "deteriorated." He admitted to using profanity with Snook "because [he] was highly upset." He testified that he "dropped out of services" when

- 7 -

he was informed that his visitations were going to be suspended.

¶ 32　　　　Respondent testified that since he started cooperating again in May 2025, he completed all the tasks required by Chestnut and had been cooperating until he was arrested on October 7, 2025. Respondent admitted he contacted Lakeia, in violation of the "no contact" order. He said all his problems with Lakeia were his fault and that she should have custody of the children because of his "ongoing legal problems." At the time of the fitness hearing, respondent was detained in the McLean County jail.

¶ 33　　　　Respondent agreed that he made at least 72 phone calls to Lakeia while he was in the Tazewell County jail for three days in December 2024. He admitted that he and Lakeia did not discuss the children in any of the phone calls. He disagreed that calling Lakeia so many times and at all hours while he was in the Tazewell County jail was "controlling."

¶ 34　　　　Respondent admitted that he did not attend the trial court hearings in September and December 2024 and left the hearing early in May 2024. He agreed that he had attorneys present for those hearings and could have contacted them. He admitted that he stopped visiting and participating in services because he was "just angry and frustrated." Respondent admitted that after he walked out of court in May 2024, he stopped cooperating with his counsel, stopped participating in services, and "was basically being rebellious of what the Court ordered of me." The parties rested.

¶ 35　　　　　　　　　　　　　　3. *Trial Court's Ruling*

¶ 36　　　　The trial court took the matter under advisement and reconvened on December 17, 2025. At that time, the court ruled that the State proved that respondent had failed to maintain a reasonable degree of interest, concern, or responsibility as to the children. The court noted that there was a time when respondent was "actively involved," but then he came to court and said he

did not want to participate and did not return to court again until he was detained in the McLean County jail. The court stated:

> "During that timeframe, he stopped again doing services, most particularly the domestic violence treatment, did not visit, did not cooperate with the agency, so the Court can also consider, other than visitation, all the services that were recommended and ordered as well, and there was just not cooperation towards the latter part of this case prior to the filing of the petition to terminate [his] parental rights."

¶ 37 The trial court appreciated that respondent took accountability and responsibility for his actions but stated that "he hasn't done what has been required pursuant to [the] service plan and the directives of this Court." Thus, the court found that the State established by clear and convincing evidence that respondent had failed to maintain a reasonable degree of concern, interest, or responsibility as to his children's well-being "because of the lack of involvement in the services and visitation."

¶ 38                  I. Best Interest Hearing and Termination of Parental Rights

¶ 39 The trial court then held the best interest hearing. After the hearing, the court took the matter under advisement. On February 10, 2026, the court ruled that it was in the best interest of the minors for respondent's parental rights to be terminated. The court entered a written order terminating respondent's parental rights and appointing the guardianship administrator of DCFS as guardian of the minors, with the power to consent to their adoption.

¶ 40 This appeal followed.

¶ 41                                II. ANALYSIS

¶ 42 Respondent argues that the trial court erred in finding that he was unfit for failing

to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2024)). He does not contest the court's best interest determination.

¶ 43    Section 1(D) of the Adoption Act lists the grounds pursuant to which a parent may be found unfit for purposes of terminating parental rights (750 ILCS 50/1(D) (West 2024)). Any one ground is sufficient to prove unfitness and must be established by clear and convincing evidence. *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 88. We will not set aside a trial court's finding of unfitness unless it is against the manifest weight of the evidence. *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 88. "A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." (Internal quotation marks omitted.) *In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 32.

¶ 44    The only ground for unfitness the State pursued against respondent is articulated in subsection (b) of section 1(D) of the Adoption Act: "[f]ailure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2024). "The language of this subsection is disjunctive." *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 91. "A court may properly base a finding of unfitness on a parent's failure to maintain a reasonable degree of interest *or* concern *or* responsibility for the child's welfare." (Emphases in original.) *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 91. All three must be present to avoid a finding of unfitness. *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 92.

¶ 45    "A parent is not fit merely because the parent has shown some interest in or affection for a child." *Tr. A.*, 2020 IL App (2d) 200225, ¶ 50. "Rather, the interest, concern and responsibility must be objectively reasonable." *Tr. A.*, 2020 IL App (2d) 200225, ¶ 50. "Failure of a parent to comply with the directives of a service plan 'is tantamount to objectively unreasonable interest, concern, or responsibility as to the child's welfare.' " *Tr. A.*, 2020 IL App (2d) 200225,

¶ 50 (quoting *In re M.J.*, 314 Ill. App. 3d 649, 657 (2000)). Infrequent or inconsistent visits are another "indication a parent is not showing reasonable interest, concern, or responsibility in a child." *In re Y.F.*, 2023 IL App (1st) 221216, ¶ 43; see *In re D.D.*, 2022 IL App (1st) 220410, ¶ 74 (stating that another example of unfitness under this ground is "infrequent or irregular visitation"). "If personal visits with the child are somehow impractical, other methods of communication, such as letters, telephone calls, and gifts can demonstrate a reasonable degree of interest, concern, or responsibility." *In re C.D.*, 2020 IL App (3d) 190176, ¶ 33.

¶ 46 "In deciding whether a parent's interest in, concern for, and responsibility toward the child's welfare have been reasonable in degree, the circuit court should consider the parent's efforts to visit the child and to otherwise maintain contact with the child, as well as the parent's inquiries into the child's welfare." *In re J.H.*, 2020 IL App (4th) 200150, ¶ 72. In analyzing whether a parent is showing reasonable concern, interest, or responsibility in a child's welfare, the court should consider the parent's "actions or statements that hinder or discourage visitation." *Y.F.*, 2023 IL App (1st) 221216, ¶ 35. This unfitness ground has no time constraint. *Y.F.*, 2023 IL App (1st) 221216, ¶ 37. Under this ground, "the court may consider the entirety of a parent's conduct to determine if [he] is maintaining a reasonable degree of interest, concern, or responsibility in [his] child's welfare." *Y.F.*, 2023 IL App (1st) 221216, ¶ 37.

¶ 47 Here, the evidence showed that the children came into care in June 2023 due to domestic violence committed by respondent against Lakeia. Snook first met with respondent in November 2023 to discuss what he needed to do to have his children return home. Those requirements were to (1) engage in domestic violence services, (2) attend parenting classes, (3) engage in counseling, (4) obtain a substance abuse assessment, (5) cooperate with the agency and caseworker, (6) obtain stable employment and housing, and (7) visit his children regularly.

From November 2023 to January 2024, respondent engaged in some of these services. He completed a parenting class, started counseling, obtained a substance abuse assessment, and visited his children. However, on February 1, 2024, respondent notified Snook that he would no longer be visiting his children, cooperating with her, or completing any services. As a result, he was discharged from counseling and domestic violence treatment. It was not until 15 months later, in May 2025, that respondent contacted Snook again and indicated he wanted to reengage in services. Respondent did so for a few months, until approximately September 2025, which was the last time he visited his children. By then, the State had filed a petition to terminate his parental rights because of his showing of disinterest in his children for over a year.

¶ 48    When considering the totality of the evidence, we cannot say that the trial court's ruling as to section 1(D)(b) was against the manifest weight of the evidence. While there were two brief periods, from November 2023 to January 2024, and May 2025 to September 2025, when respondent engaged in some services and visited his children, for well over half the life of this case, respondent voluntarily chose not to visit his children or engage in any services. Engaging in services and visiting his children regularly are two of the most important considerations in determining if a parent has shown a reasonable degree of interest, concern, or responsibility as to his children. See *Tr. A.*, 2020 IL App (2d) 200225, ¶ 50; *Y.F.*, 2023 IL App (1st) 221216, ¶ 43; *D.D.*, 2022 IL App (1st) 220410, ¶ 74. Here, respondent did neither for a period of 15 months, through no one's fault but his own. While it is true that respondent's visitation was suspended by the agency at some time, the evidence showed that the suspension was the result of respondent's behavior toward agency staff and that respondent could pursue supervised visitation, but he never did. Additionally, as soon as respondent contacted Snook in May 2025 and completed a family plan, his visitation was started again, showing his actions determined whether he had visitation

with his children. It is appropriate to consider that respondent's actions hindered, discouraged, and even prevented his visitation. See *Y.F.*, 2023 IL App (1st) 221216, ¶ 35.

¶ 49    In his brief, respondent argues that his efforts were merely "inconsistent," not unreasonable. We disagree. A parent who is showing a reasonable degree of interest, concern, and responsibility for his children does not unilaterally decide not to visit them or engage in any court-ordered services for 15 months because the parent is "angry and frustrated." Not only does the evidence show that respondent did not visit his children during that 15-month period, there is no evidence that he took any actions to show interest in or concern for them. He never called the caseworker or his attorney to ask about them, never sent them cards, letters, or gifts, and admitted he never talked about the children during his many telephone conversations with Lakeia. See *C.D.*, 2020 IL App (3d) 190176, ¶ 33.

¶ 50    Respondent also contends that he showed concern, responsibility, and interest because he completed a parenting class and a substance abuse assessment in the first few months of care and completed counseling during the last few months of care. However, completing only three services in the span of two years does not demonstrate interest, responsibility, or concern where the evidence shows that respondent failed to complete the majority of services and responsibilities required by the service plan, including obtaining stable housing and employment, cooperating with the agency and caseworker, and regularly and consistently visiting his children. See *Tr. A.*, 2020 IL App (2d) 200225, ¶ 50 ("Failure of a parent to comply with the directives of a service plan 'is tantamount to objectively unreasonable interest, concern, or responsibility as to the child's welfare.' " (quoting *M.J.*, 314 Ill. App. 3d at 657)). Most importantly, respondent never completed treatment for domestic violence, the reason the children came into care in the first place.

¶ 51    A reasonable person interested in reunification with his children would visit his

children and actively participate in the services provided for his family's benefit. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 31. Respondent failed to do so for the majority of the life of this case. Under these circumstances, the trial court's determination that respondent did not show a reasonable degree of interest, concern, or responsibility as to his children is not against the manifest weight of the evidence.

¶ 52                                    III. CONCLUSION

¶ 53            For the reasons stated, we affirm the trial court's judgment.

¶ 54            Affirmed.