2023 IL App (1st) 230717-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FIRST DIVISION
October 30, 2023

No. 1-23-0717

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

|  |  |
|---|---|
| | ) Appeal from the |
| | ) Circuit Court of |
| | ) Cook County |
| *In re* M.M., S.A.M., and K.M., minors, | ) |
| | ) No. 17-JA-82 |
| | )    17-JA-83 |
| (People of the State of Illinois, petitioner-appellee v. P.B., | )    18-JA-935 |
| respondent-appellant). | ) |
| | ) The Honorable |
| | ) Peter J. Vilkelis, |
| | ) Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The trial court's finding that the respondent was unfit to have a child was not against the manifest weight of the evidence and is affirmed.

¶ 2    The respondent, P.B., appeals from the trial court's order finding her unfit to have a child under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) as a predicate for terminating her parental rights over minors M.M., S.A.M., and K.M. under section 2-29(2) of the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 2022)). Appellee briefs were filed by the State and by the Office of the Cook County Public Guardian on behalf of the three minors. For

the reasons that follow, we affirm the judgment of the trial court.

¶ 3                                  I. BACKGROUND

¶ 4                              A. Procedural Background

¶ 5        This action commenced on January 27, 2017, when the State filed a petition for the adjudication of wardship of M.M., born January 23, 2016, and S.A.M., born November 8, 2016. An additional such petition was filed on September 20, 2018, concerning K.M., born July 23, 2018. The respondent is the mother of these three minors, as well as of several other children. The fathers of each of these minors was found by the trial court to be unfit by clear and convincing evidence, and the fathers' cases are not the subject of this appeal.

¶ 6        The petitions filed on behalf of M.M. and S.A.M. alleged that they were abused and neglected. Both petitions presented allegations that S.A.M., who had been born premature with congenital hypothyroidism, was not taken to multiple medical appointments or given prescribed medications by the respondent. He had recently been hospitalized and diagnosed with non-organic failure to thrive. Medical personnel described him as severely malnourished and expressed concerns about the respondent's ability to parent. On January 27, 2017, a temporary custody hearing order was entered, in which the court found probable cause existed that the minors were abused and neglected based on the alleged facts. M.M. and S.A.M. were thus removed from the respondent's care.

¶ 7        On December 18, 2017, the trial court entered orders adjudicating both M.M. and S.A.M. neglected as a result of injurious environment, as well as for lack of care as to S.A.M. Its findings were consistent with the allegations set forth in the petitions for adjudication of wardship. On January 31, 2018, disposition orders were entered adjudicating both minors as wards of the court and finding the respondent unable to care for them. A permanency goal for the two minors to return

home within 12 months was also established that day.

¶ 8 On July 23, 2018, K.M. was born, and a petition for adjudication of wardship concerning him was filed on September 20, 2018. A temporary custody order was entered that day, and K.M. was removed from the respondent's care. On February 4, 2019, a disposition order was entered adjudicating K.M. a ward of the court and finding the respondent unable to care for him.

¶ 9 On October 28, 2019, a permanency hearing was conducted as to all three minors. Following that hearing, the trial court ordered a change in the permanency goal to substitute care pending a determination by the trial court on the termination of parental rights.

¶ 10 On April 2, 2021, the State filed petitions on behalf of all three minors seeking the termination of the respondent's parental rights. Pertinent to this appeal, the petition alleged that the respondent was unfit under three of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)): (1) ground (b) for failure to maintain a reasonable degree of interest, concern or responsibility as to the children's welfare (*id.* § 1(D)(b)); (2) ground (c) for desertion of the children for more than three months next preceding the commencement of termination proceedings (*id.* § 1(D)(c)); and (3) ground (m) for failure to make reasonable efforts to correct the conditions that were the basis of removal or to make reasonable progress toward reunification during a nine-month period following the adjudication of neglect (*id.* § 1(D)(m)).

¶ 11 B. Unfitness hearing

¶ 12 The unfitness hearing at issue initially commenced on August 10, 2022, although the court proceedings that day consisted only of the State's tendering of 14 trial exhibits. The matter was then continued several times to March 23, 2023, at which time four respondent's exhibits also were admitted into evidence. At the State's request, the trial court also took judicial notice of a number of matters concerning the procedural background of the case. The pertinent exhibits and judicially

noticed facts are addressed below and in our analysis.

¶ 13                                  *1. Witness testimony*

¶ 14        The State's first witness was Linda Baldwin, a caseworker for the Department of Children and Family Services (DCFS). Baldwin was the assigned caseworker for M.M., S.A.M., and K.M. from September 2018 until April 2019. At the time of Baldwin's assignment, the respondent was in need of the following services under the service plan developed by DCFS to facilitate reunification: individual therapy, parent psychotherapy, substance abuse services, random toxicology screens, and visitation.

¶ 15        For individual therapy, Baldwin referred the respondent to One Hope United. The respondent did not provide Baldwin with documentation that she had completed that service, but Baldwin did receive a report from the provider indicating that the respondent was somewhat consistent with participation in that service. Also, random toxicology screenings for the respondent were being done by TASC (Treatment Alternatives for Safe Communities).

¶ 16        On January 29, 2019, Baldwin took part in an administrative case review with the respondent, her attorney, and the case reviewer, to advise the respondent of the services she still needed to complete under her service plan for reunification. At that meeting, the respondent stated that she believed she had completed all the services except employment and housing. However, Baldwin never received communication that the respondent had in fact completed her required services.

¶ 17        Baldwin testified to an incident on March 11, 2019, when a supervised visitation was to take place at 11:00 a.m. When Baldwin arrived that day at 10:45 a.m., the minor and transporter were present, but the respondent did not arrive. After waiting 30 minutes, Baldwin called the respondent, who reported that she was asleep and had forgotten the visit. She did not attend the visit that day. Baldwin characterized the respondent as "inconsistent" about attending visitations and testified

that the respondent never provided gifts, cards, or letters to the children.

¶ 18    The State's second witness was Nina Alhaj, who testified that she became the assigned caseworker for M.M. and K.M. in April 2019 and continued in that role through December 2019. She was then employed with Shelter, Inc., the agency to which DCFS had transferred the case in April 2019. At that time, the services of which the respondent was still in need under her service plan included individual therapy, random toxicology screening through TASC, a parenting capacity assessment, and visitation.

¶ 19    At the time the case was transferred, the respondent had been participating in individual therapy through One Hope United, but she had not completed it. In July 2019, she was unsuccessfully discharged from therapy by that provider due in part to the fact that Shelter, Inc., did not have a contract with it, as well as her therapist's conclusion that the respondent lacked the cognitive abilities to focus on the reasons why the case had been opened. One Hope United had recommended a shift in the focus of therapy, which had been skills-based, to independent living skills and programs for parents with disabilities. However, Alhaj did not refer the respondent for such services because the respondent told her she was not interested in gaining independent housing. She was living with her sister and wanted to continue doing so. The respondent also told her that she was not interested in reengaging in therapy or increasing her visitation with the children. Alhaj never received proof that the respondent had completed individual therapy.

¶ 20    Alhaj testified that random toxicology screens were being requested of the respondent. Alhaj testified that in October 2019, there were two positive toxicology reports. These positive toxicology reports caused Alhaj to consider substance abuse services to have been unsuccessful completed.

¶ 21    Alhaj testified that a parenting capacity assessment was conducted in June 2019 through the

Cook County Juvenile Court Clinic. The recommendations from that assessment were for the respondent to have more frequent and longer visitations, to attend the children's medical and educational appointments, to engage in therapy, to obtain independent housing, to continue random toxicology testing, and to possibly participate in a nurturing parent program. The assessment also identified the respondent as having cognitive deficits and recommended she receive therapy with ample repetition in view of those deficits.

¶ 22    Regarding visitation, Alhaj testified that this was initially scheduled to take place three times per week. However, in April 2019, the respondent requested that visitation be reduced to once per week. The respondent told Alhaj that visiting three times a week was "overwhelming." The respondent was never interested thereafter in increasing her visits to more than once a week.

¶ 23    Alhaj testified that problems had occurred whereby the children would be brought by their foster parents for scheduled visitations, but the respondent would then fail to appear or to cancel the appointments in advance. Accordingly, a protocol was put in place whereby the respondent was required to call or text Alhaj at 9:00 a.m. on the morning of a scheduled appointment, and her failure to do so would result in the cancellation of that morning's visitation, which would otherwise be at 11:00 a.m. Alhaj testified that, from April 2019 to December 2019, the respondent would only call or text to confirm visitations "about once or twice a month." She testified that the respondent had told her that the reason she did not confirm visits was "that 9:00 a.m. was too early, and it was inconvenient for her."

¶ 24    Alhaj testified that she did supervise numerous visitations and had concerns as a result of the respondent's contact with her children. She explained that in those visitations, the respondent struggled to supervise all the children at once. She required prompts to remember to feed them, change diapers, or respond to their cues to use the bathroom. Due to these concerns, Alhaj was

never able to recommend unsupervised visits. She testified that the respondent's incomplete services, including that she was not in individual therapy, that she had positive toxicology drops, and that she had not reengaged in substance abuse treatment were also reasons why she did not recommend unsupervised visitation. Alhaj testified that the respondent never provided cards, gifts, or letters to her children.

¶ 25        Questioning then turned to M.M.'s father. After three questions on this topic, the respondent's attorney interposed an objection that "[t]he positive drops are hearsay." After pointing out the untimeliness of this objection, the trial court overruled it. In doing so, the trial court stated:

"The Court is taking judicial notice of the fact that on October 28th, 2019, this Court heard testimony that [the respondent] tested positive for amphetamines, methamphetamines, and Ecstasy in that time frame. She was pregnant at the time, and there was a concern about false positives, so they were sent in for confirmation, and they did confirm that she tested positive for amphetamine, methamphetamine, Ecstasy, and we heard that testimony on October 28th, 2019, so your objection's overruled."

Later, on cross-examination by the respondent's attorney, the State objected to a question posed to Alhaj about whether she had learned that the respondent's pregnancy could have caused false positives. Overruling that objection also, the trial court stated:

"Well, [the respondent's attorney] previously interposed an objection to the results of those urinalyses, and as I indicated, I'm taking judicial notice of the fact that the testimony that we received by Ms. [Alhaj] *** on October 28, 2019, was that because TASC indicated pregnancy could cause false positives, the results of those tests were sent in for confirmation, and they do, in fact, confirm the positive results for amphetamine, methamphetamine, and Ecstasy."

¶ 26    The final witness called by the State was J'Taia Miller. She testified that she was currently employed as a caseworker at Shelter, Inc. She had been the assigned caseworker for the family from February 2022 to the present. Miller testified that, at the current time, the services of which the respondent was still in need included individual therapy, random toxicology screenings, and more consistent visitation.

¶ 27    Miller testified that, for about the past year and a half, the respondent had been living in Minnesota, where she had voluntarily relocated. She had not provided Miller with documentation that she had completed services, but Miller was informed by a caseworker there at she was engaged in services. Miller testified that she never sent cards, gifts, or letters to her children. She was allowed one visitation per month with her children, but since Miller was assigned to the case in February 2022, the respondent had not attended any visits. This was primarily due to her relocation to Minnesota. Miller testified that, when she learned the respondent was planning to be in Chicago around Thanksgiving 2022, she contacted her about scheduling a visitation then; however, the respondent never called her back. Miller testified that the respondent's last visitation with her children had occurred in January 2020. She also testified that the agency had offered "virtual' visitation to the respondent, but that had not occurred for M.M. or K.M.

¶ 28    The State and public guardian then rested as to the unfitness hearing. In the respondent's case, the trial court took judicial notice of testimony given by Lakeshia Robinson-Bell on October 15, 2018, that she met the respondent in June 2017 for 10 sessions of parenting classes, 2 times per week, and coaching began in February 2018, for 10 sessions every other week. Robinson-Bell testified that "she had no red flags." The respondent then rested.

¶ 29                              *2. Closing arguments*

¶ 30    The matter then proceeded to closing arguments. The State requested the trial court to make

findings of unfitness as to respondent under grounds (b), (c), and (m). As to grounds (b) and (c), the State cited Miller's testimony that the respondent's last visit with the children had been in January 2020. Prior to then, she had voluntarily reduced her visitation from three times a week to once a week, and she would frequently fail to confirm those visits with a 9:00 a.m. phone call.

¶ 31 As to ground (m), the State argued that a lack of progress was shown by her psychological evaluation (in June 2018), which stated that she had demonstrated poor insight into why her family's case came in. The State pointed out that, although she did complete a parenting class, she failed to make progress in other services that she was required to complete, including independent therapy and substance abuse. It argued she failed to make progress in substance abuse, as the TASC records in evidence showed that she tested positive two times in October 2019 for amphetamines and methamphetamines. The State also argued that, although the parenting capacity assessment recommended that she increase visits with her children, the evidence had shown that she simply was not interested in doing so.

¶ 32 The respondent's attorney argued in closing that the respondent's cognitive deficits had only been discovered in June 2019 during the juvenile court clinic's parenting capacity evaluation, and the services that were offered to her in this case failed to accommodate and address her disabilities. The respondent's attorney argued that she had completed most of the services required of her, and only those services after June 2019 should be considered because the ones before that failed to adequately address her cognitive deficits and thus help with reunification. The respondent's attorney argued that she was consistent with visitation for the majority of the case and only dropped off in the last couple of months due to scheduling and commuting issues.

¶ 33 In rebuttal, the State pointed out that Alhaj had testified that the respondent was not interested in the additional individual therapy services and increased visitation recommended by the juvenile

court clinic after June 2019. Instead, the respondent had requested to decrease her visits with the children from three times a week to one.

¶ 34 *3. Trial court's ruling*

¶ 35 Following the conclusion of evidence and closing arguments, the trial court found that the State had met its burden of proving by clear and convincing evidence that the respondent was unfit under grounds (b), (c), and (m). It began its ruling by refuting the respondent's attorney's contention that the respondent's cognitive deficits had not been discovered until June 2019, pointing out that her June 2018 psychological evaluation referenced her full-scale IQ being 65, described her as having a mild intellectual disability, and opined that she lacked the emotional and intellectual resources to parent effectively. The court also set forth the findings that had led to the initial finding of neglect in 2017. It then summarized the testimony of the three witnesses, focusing on their testimony concerning the respondent's lack of visitation and failure to complete services. The court also briefly mentioned the respondent's positive toxicology results in 2019 while she was pregnant with another child. The court pointed out that it recognized that the respondent had put into evidence certain exhibits showing her completion of some services, "but most recently in 2019, and this is 2023, so the completion of services was from years ago, and we haven't had a visit in over a year."

¶ 36 C. Best interest hearing

¶ 37 The matter then immediately proceeded to hearing on whether termination of parental rights was in the best interests of the children. As this aspect of the case is not the subject of appeal, we briefly summarize the testimony from that part of the hearing. Miller was the first witness to testify. She testified that M.M., currently age 7, and K.M., currently age 4, have been placed together in a traditional foster home since September 2018. It is a pre-adoptive foster home, and the foster

parents, with whom the two boys are well-bonded, have stated that they want to adopt them. Miller testified that it would be in the boys' best interests to be adopted by their current foster parents due to the lack of visitation and completion of services by the respondent, as well as the boys' recognition of their foster parents as "basically their biological parents." Miller stated during this testimony that her last conversation with the respondent had occurred in December 2022 at a child and family team meeting.

¶ 38        Aesha Jackson testified that she is a case manager with the Children's Place Association, and since 2019 she has served as the caseworker for S.A.M., currently age 6. She explained that, since June 2018, S.A.M. has been in a relative placement in a specialized foster home due to his medical needs. A younger brother of S.A.M., not the subject of this appeal, is also placed in the same foster home. Jackson testified that S.A.M. is bonded and attached to his foster mother, calls her "Mama." The foster parents are separated, but S.A.M. is also bonded to his foster father and calls him "Papa." S.A.M. currently has an individualized education plan to address his developmental needs, through which he has been receiving occupational and physical therapy and social work services. He is in need of ongoing medical care due to hypothyroidism and dysplasia which resulted from the surgery he had as an infant, which requires a special diet. His foster parents have always ensured that he attends these appointments and that he receives his necessary services and diet. Jackson believes that it is in the best interest of S.A.M. to terminate the respondent's parental rights, as he is in need of a sense of permanency at this time.

¶ 39        Both foster mothers testified. The foster mother of M.M. and K.M. testified that she and her husband want to adopt the two boys, that their relationship with them was "very close," and that they had become part of their family. The foster mother of S.A.M. testified that she is his maternal cousin. She testified that she and her husband want to adopt S.A.M. because they love him, he has

been with them since he was a baby, and theirs is the only home that he knows. The State and public guardian then rested as to the best-interests hearing.

¶ 40    The respondent then testified in her case-in-chief. She testified that she was not in agreement with her children being adopted. She testified that the foster mother of S.A.M., who is her cousin, does not respond to her texts and calls. She testified that she does talk to her children by video chat. She disputed the testimony that she was not in communication wither her children. She testified that DCFS had not helped her with housing but that on her own she obtained housing, had been working and in school, and was doing her services. She loved her children and wanted to be a part of their lives. The respondent then rested.

¶ 41    The trial court ruled, finding that it was in the best interests of the three minors to terminate the respondent's parental rights. In its ruling, the trial court noted that the respondent's testimony in the best-interest hearing had not persuaded it to change its earlier ruling on unfitness. The trial court appointed a guardian with the right to consent to adoption. The respondent thereafter filed a timely notice of appeal.

¶ 42                              II. ANALYSIS

¶ 43    On appeal, the respondent first argues that the trial court erred in *sua sponte* taking judicial notice that testimony had been given by Alhaj at a permanency hearing on October 28, 2019, that, due to concerns that the respondent's pregnancy might cause false positives on toxicology screenings taken around that time, the results of those tests were submitted for additional testing that did in fact confirm positive test results within the category of amphetamine, methamphetamine, and Ecstasy. The respondent argues that the facts about which the trial court took *sua sponte* judicial notice were inaccurate and that she suffered prejudice when the trial court relied on this inaccurate evidence in its ruling on unfitness. Second, the respondent argues that the

trial court's finding of desertion of her children during the relevant three-month period (ground (c)) was contrary to the manifest weight of the evidence. Third, she argues that the trial court erred in its consideration of the evidence in finding the respondent unfit on grounds (b) and (m).

¶ 44     For their part, the public guardian and the State primarily argue that any error in the trial court's *sua sponte* taking of judicial notice of positive toxicology test results was harmless. This is so, they contend, because even without considering the respondent's drug use, the State presented overwhelming evidence of her unfitness to meet its burden under grounds (b) and (m). They contend that the evidence, particularly concerning the respondent's lack of interest in visitation with her children, fully supports the trial court's ground (b) finding that the respondent failed to maintain a reasonable degree of interest, concern, or responsibility for their welfare. They likewise contend that abundant evidence supported the trial court's ground (m) finding, specifically that evidence showing the respondent had never made progress in the services required for reunification, particularly therapy, toxicology drops, and visitation. Finally, the State argues that the evidence that the respondent had not visited her children since January 2020 and had failed to respond to efforts to arrange in-person or virtual visits following her move to Minnesota was sufficient to support the trial court's ground (c) finding of desertion.

¶ 45     The involuntary termination of parental rights upon petition by the State is governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)). *In re D.F.*, 201 Ill. 2d 476, 494 (2002). Such proceedings involve a two-step process. See 705 ILCS 405/2-29(2) (West 2022). First, the State must prove, by clear and convincing evidence, that the parent is "unfit" as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). *In re M.I.*, 2016 IL 120232, ¶ 20. If properly proven, any one of the several grounds enumerated in section 1(D) is sufficient for a finding of

unfitness. *D.F.*, 201 Ill. 2d at 495. The second step, if the court makes a finding of unfitness, is to consider whether it is in the best interests of the child that parental rights be terminated. *Id.*

¶ 46    This court affords great deference to a trial court's finding of unfitness, because it has the best opportunity to view and evaluate the parties and their testimony; the trial court's finding will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006) (citing *D.F.*, 201 Ill. 2d at 498-99). A decision is against the manifest weight of the evidence where the opposite result is clearly evident from the record. *Daphnie E.*, 368 Ill. App. 3d at 1064. Further, each case concerning parental unfitness is *sui generis*, requiring close analysis of its individual facts; consequently, factual comparisons to other cases by reviewing courts are of little value. *Id.* A trial court's finding of unfitness may be affirmed provided sufficient evidence is presented on any single ground set forth in section 1(D). *In re A.H.*, 359 Ill. App. 3d 173, 180 (2005); accord *M.I.*, 2016 IL 120232, ¶ 43.

¶ 47                                           A. Ground (b)

¶ 48    Because we find it potentially dispositive of other issues, we choose to begin our analysis with the question of whether the trial court's finding under ground (b) was against the manifest weight of the evidence. A person may be found unfit to have a child on the grounds of his or her "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2022). These are three disjunctive qualities, any of which can support a finding of unfitness, and there is no time constraint that limits a court's consideration of a parent's conduct under ground (b). *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶¶ 21, 24.

¶ 49    In determining whether a parent has shown a reasonable degree of interest, concern or responsibility for a child's welfare, courts consider a parent's efforts to visit and maintain contact with the child, as well as other indicia of interest, such as inquiries into the child's welfare. *Daphnie*

*E.*, 368 Ill. App. 3d at 1064 (citing *In re Adoption of Syck*, 138 Ill. 2d 255, 278-79 (1990)). Courts consider a parent's conduct in the context of the circumstances in which it occurs, accounting for difficulties such as a lack of transportation to the child, the parent's poverty, conduct of others that hinders visitation, and the motivation underlying the failure to visit. *Daphnie E.*, 368 Ill. App. 3d at 1064 (citing *Syck*, 138 Ill. 2d at 278-79). Circumstances such as an intellectual disability do not necessarily redeem a parent's failure to demonstrate reasonable interest, concern, or responsibility, nor do such circumstances fix a different standard of reasonableness. *M.I.*, 2016 IL 120232, ¶ 29. Rather, in such cases the issue is whether the parent's then-existing circumstances present a valid excuse. *Id.* (citing *Syck*, 138 Ill. 2d at 276). A parent does not need to be at fault to be unfit, but she will not be considered fit merely because she has demonstrated some interest in or affection toward a child. *Daphnie E.*, 368 Ill. App. 3d at 1064. Visitation is the primary consideration, but if that is shown to be somehow impractical, courts may consider other factors demonstrating interest, concern, or responsibility, such as phone calls, letters, gifts, or the like. *M.I.*, 2016 IL 120232, ¶ 36 (citing *Syck*, 138 Ill. 2d at 279). Evidence of a parent's infrequent or sporadic visitation will support a finding of unfitness under ground (b). *M.I.*, 2016 IL 120232, ¶ 36; *In re Y.F.*, 2023 IL App (1st) 221216, ¶¶ 43, 46; *In re Janira T.*, 368 Ill. App. 3d 883, 893 (2006).

¶ 50    We conclude from our review of the record that the trial court's finding that the respondent failed to maintain a reasonable degree of interest, concern or responsibility for the welfare of her three minor children was not against the manifest weight of the evidence. Instead, we find the trial court's determination to be fully supported by the evidence, particularly concerning the respondent's lack of effort to have visitation with her children.

¶ 51    The State presented testimony by three caseworkers demonstrating that, since early 2019, the respondent had made minimal efforts to have visitation with M.M., S.A.M., and K.M., to maintain

contact with them, or to show any reasonable indicia of interest or concern into their welfare. Miller, the family's current caseworker at the time of the hearing, testified that despite being entitled then to one monthly visit, the respondent had never visited the children since Miller's assignment to the case 13 months earlier. The respondent had voluntarily relocated to Minnesota a year and a half prior to the hearing while the case was pending, and Miller testified that she understood that her last visitation had occurred in January 2020. Miller further testified that the respondent had not accepted the agency's offer to participate in "virtual" visitation. Miller testified that, when she learned that the respondent was planning a visit to Chicago around Thanksgiving 2022, Miller made efforts to schedule a visitation then. However, Miller testified that she never received a response or return call from the respondent. Miller also testified that the respondent has never sent cards, gifts, or letters to the children.

¶ 52        The testimony of Alhaj and Baldwin demonstrated that the respondent's lack of effort or interest in visitation with her children had been ongoing for several years. Alhaj testified that when she was assigned to the case in April 2019, the respondent had the right to visitation three times a week, but she voluntarily reduced this to one visitation per week because she found three visits per week to be "overwhelming." Even then, Alhaj explained that visits only occurred once or twice a month because the respondent would fail to call or text her at 9:00 a.m. to confirm that she planned to attend that day's visit at 11:00 a.m. She testified that the respondent told her that 9:00 a.m. was too early and that it was inconvenient for her. Baldwin likewise testified to an incident in March 2019 where the children were brought to a visit that the respondent had forgotten about and failed to attend, and Baldwin characterized the respondent as "inconsistent" with visitations. This evidence of the respondent's disinterest in visitation fully supports the trial court's ground (b) ruling. See *Y.F.*, 2023 IL App (1st) 221216, ¶¶ 43, 46; *Janira T.*, 368 Ill. App. 3d at 893.

¶ 53        On appeal, the respondent argues that the trial court erred in its consideration of the evidence, specifically by discounting the evidence of her efforts at participating in and completing some required services toward reunification. This includes her successful completion of a parenting program in October 2017 and parent coaching sessions in July 2018. She cites her completion of outpatient treatment for substance abuse (marijuana) in July 2018, wherein she was described as "motivated for treatment" and "want[ing] to regain custody of her children." She cites to evidence of her participation in at least five therapy sessions with One Hope United between November 2018 and January 2019, in which her therapist explained that she was working toward her goals. She points out that she did ultimately undergo a psychological evaluation in June 2018. She cites Baldwin's testimony that she participated in an administrative case review in January 2019, as well as Miller's testimony that she participated in a child-family team meeting as recently as December 2022. She also points out that she attended the adjudication and disposition hearings.

¶ 54        Additionally, she references the fact that she attended the parenting capacity evaluation with the juvenile court clinic in June 2019, including interactive sessions with the children, and that she was described in the evaluation report as "demonstrat[ing] some parenting knowledge and skills within a monitored and time-limited environment" with no significant concerns reported over years of supervised visits. She emphasizes the report's description of her as having affection toward and interest in her children.

¶ 55        We reject the respondent's argument that the trial court erred in its consideration of the evidence concerning the respondent's efforts toward the services required for reunification. Although completion of service plan objectives can be considered as evidence of a parent's interest, concern, and responsibility (*Daphnie E.*, 368 Ill. App. 3d at 1065), ground (b) "does not hinge on a parent's compliance with a service plan or directives." *M.I.*, 2016 IL 120232, ¶ 39.

Rather, the primary consideration is visitation. *Id.* ¶ 36. Here, the trial court specifically stated in its ruling that it was considering the evidence of the respondent's completion of some services. It went on to note, though, that the most recent evidence involving the completion of some services was from 2019, "and this is 2023, so the completion of services was from years ago, and we haven't had a visit in over a year." It is clear from the trial court's statements that it took into account the evidence cited by the respondent but found that it was outweighed by the respondent's prolonged failure to engage in visitation after completing those services. It was the role of the trial court to weigh this evidence and to determine the inferences to be drawn therefrom, and this court will not substitute its judgment on decisions of this nature. *D.F.*, 201 Ill. 2d at 499. The trial court's determination in this regard was fully supported by the evidence.

¶ 56 The respondent further argues on appeal that the trial court did not give sufficient consideration to the fact that, prior to the recognition of her mild intellectual disability during her psychological evaluation in June 2018, the evidence demonstrated her positive parenting interactions toward her children and that she was capable of maintaining employment. She cites the following evidence included in the exhibits and matters of which the court had taken judicial notice: (1) Robinson-Bell's testimony from 2018 that she saw "no red flags" during parenting classes in 2017 and parent coaching sessions in 2018; (2) a stipulation of facts at the adjudication hearing of December 18, 2017, that, other than S.A.M., the minors removed from the respondent's care in January 2017 had appeared healthy and well cared for; (3) a stipulation of facts from the adjudication hearing for K.M. on January 24, 2019, that on the occasion in August 2018 when DCFS first learned that K.M. had been born, the respondent's interactions with him were noted to be safe and appropriate; and (4) that the respondent maintained full-time employment as a cashier at McDonald's for five years prior to 2018, as well as two years working at White Castle and two

years as a home healthcare assistant. She argues that the significance of this evidence is that it demonstrates that, despite experiencing a mild intellectual disability, she possesses or could develop better adaptive functioning if she received adequate training. She faults the agency and her caseworkers for failing to offer her services directed at addressing her disability, noting that this had been one of the juvenile court clinic's recommendations following its assessment.

¶ 57    We again reject this argument. This argument is primarily an effort to have this court reweigh the evidence and draw different conclusions from it than the trial court did, which is not the role of the reviewing court. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 51; *In re J.B.*, 2014 IL App (1st) 140773, ¶ 49 ("We give great deference to the trial court's finding of unfitness, defer to the trial court's factual findings and credibility assessments, and will not reweigh the evidence anew on appeal."). The cited evidence does not show that the opposite result is "clearly evident" so as to support reversal under the manifest weight standard. *Daphnie E.*, 368 Ill. App. 3d at 1064.

¶ 58    Moreover, under ground (b) the significance of a parent's intellectual disability is whether it presents a circumstance that provides a valid excuse for what would otherwise appear to be the failure to maintain a reasonable degree of interest, concern, or responsibility in the child's welfare. See *M.I.*, 2016 IL 120232, ¶ 29. However, the existence of an intellectual disability does not fix a different standard of reasonableness, and it does not necessarily or automatically redeem a failure to demonstrate reasonable interest, concern, or responsibility. *Id.* In *M.I.*, the supreme court affirmed a ground (b) finding of unfitness based on evidence of a father's "sporadic visitation" of his child, where attending visitation was not a task beyond his intellectual capacity. *Id.* ¶ 36.

¶ 59    In this case, we find no evidence in the record that the respondent's mild intellectual disability provided a valid excuse for her failure to visit her children for at least 13 months prior to the hearing, including declining offers of virtual visitation, and for her diminishing interest in

visitation for several years prior to that. As in *M.I.*, the evidence here showed that she was capable of attending visitation when she wanted to, at least prior to her voluntary relocation to Minnesota. It is evident from the trial court's remarks that it was fully aware of her mild intellectual disability and took it into account as part of its findings. We find no error by the trial court in this regard.

¶ 60                                 B. Grounds (c) and (m)

¶ 61        Because we have concluded that the trial court's finding that the respondent was unfit under ground (b) was not against the manifest weight of the evidence, we have no need to consider the respondent's arguments that it erred by finding her unfit under grounds (c) and (m) also. *Y.F.*, 2023 IL App (1st) 221216, ¶ 47 (citing *M.I.*, 2016 IL 120232, ¶ 43). As stated above, a trial court's finding of unfitness will be affirmed provided sufficient evidence is presented on any single ground enumerated in the statute. *A.H.*, 359 Ill. App. 3d at 180.

¶ 62                                   C. Judicial Notice

¶ 63        Finally, we address the respondent's argument that the trial court erred by *sua sponte* taking judicial notice that testimony had been given at a permanency hearing in October 2019 that toxicology samples taken that month were submitted for additional testing, which confirmed positive test results in the category of amphetamine, methamphetamine, and Ecstasy. We note that neither the State nor the public guardian directs our attention to any place in the record where testimony or evidence supporting this fact exists. However, we agree with the argument of the State and public guardian that, even if the trial court did err by taking judicial notice of this purported fact, it did not result in prejudice to the respondent so as to affect the outcome of the unfitness hearing. See *In re Leona W.*, 228 Ill. 2d 439, 460 (2008); *In re J.G.*, 298 Ill. App. 3d 617, 629 (1998).

¶ 64        Although the trial court mentioned the respondent's positive toxicology results from October

2019 as part of its ruling on unfitness, its remarks do not suggest that this evidence played any significant factor in its findings of unfitness. Rather, as discussed above, the primary factor was the respondent's failure to participate in any form of visitation with her children in the 13 months prior to the hearing, preceded by multiple years of her participating in only sporadic and irregular visitation. The properly admitted evidence of the respondent's prolonged disinterest in visitation with her children overwhelmingly established her failure to maintain a reasonable degree of interest, concern, or responsibility toward them. This had nothing to do with drug use or an instance of positive toxicology results three and a half years earlier. Accordingly, we reject the respondent's argument that she suffered prejudice from the allegedly incorrect fact of which the court *sua sponte* took judicial notice.

¶ 65                              III. CONCLUSION

¶ 66        For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 67        Affirmed.